## MORROW SHOE MANUF'G CO. v. NEW ENGLAND SHOE CO. et al.

### (Circuit Court of Appeals, Seventh Circuit. October 2, 1893.)

#### No. 71.

1. CREDITORS' BILL—SETTING ASIDE FRAUDULENT CONVEYANCE.
   A creditors' bill to set aside a fraudulent conveyance must allege that the plaintiff has prosecuted his claim to judgment, and had an execution issued thereon, which has been returned unsatisfied. Scott v. Neely, 11 Sup. Ct. Rep. 712, 140 U. S. 106, and Cates v. Allen, 13 Sup. Ct. Rep. 883, 977, 149 U. S. 451, followed.

2. SAME—REVIEW ON APPEAL—OBJECTIONS NOT RAISED BELOW.
   The objection that such a bill is not broad enough to warrant a decree compelling the fraudulent grantee to account to the creditor comes too late when raised for the first time on appeal.

3. AUCTIONEER—LIABILITY FOR SELLING GOODS OBTAINED BY FRAUD.
   An auctioneer who sells goods which have been obtained by fraud, and who had notice of the fraud, is liable to account for the goods to the persons from whom they were fraudulently obtained.

4. FRAUDULENT CONVEYANCE—NOTICE—EVIDENCE.

Defendants knew that a merchant from whom they obtained goods which he had procured by fraud was selling large quantities of goods at auction for less than he could have bought them, and that he had secretly stored $50,000 worth of goods in a loft remote from his store. One defendant gave a false account of the transaction, and the other received letters from the merchant, intentionally delivered to him while he was on the street, and failed to account for such letters. *Held*, that the evidence was sufficient to charge defendants with notice that the goods had been procured by fraud. Bunn, District Judge, dissenting.

5. SAME—BURDEN OF PROOF.

Defendant lent $20,000 on a stock of goods stored in a warehouse. Before making the loan he examined the goods, which were in the original cases, from which the names and marks had just been scraped off. The loan was made to a corporation, concerning which he made no inquiries at the time, though he was informed that it was being pressed by its creditors. The goods had been fraudulently obtained by the corporation. *Held*, that evidence of these facts threw on defendant the burden of proving that the loan was made in good faith. Bunn, District Judge, dissenting.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

In Equity. Creditors' bill by the Morrow Shoe Manufacturing Company against the New England Shoe Company and others. The bill was taken pro confesso against the New England Shoe Company and another, but on final hearing was dismissed as to the other defendants. Complainant appeals. Reversed.

Statement by BAKER, District Judge:

This suit was brought in the court below by the Morrow Shoe Manufacturing Company, appellant, on its own behalf and for the benefit of all other creditors, against the New England Shoe Company, an insolvent corporation, which was impleaded with George P. Gore, H. H. Heimerdinger, Merrick F. Prouty, and Hiram B. Peabody, appellees herein, and certain others not parties to this appeal. The New England Shoe Company, an Illinois corporation, purported to be organized with an authorized capital of $50,000, divided into 500 shares of $100 each, of which 498 shares were owned by Charles C. Davis, who was its president and treasurer, one share was owned by his son, Charles A. Davis, who was its secretary, and one share was owned by Henry W. Sawyer. These three composed its board of directors. The bill was taken pro confesso against the New England Shoe Company and Charles C. Davis, and on final hearing it was dismissed as to the other defendants. The cause was heard and decided on its merits on the facts presented in the record, and the decree dismissing the bill was placed on the ground that notice or knowledge of the fraudulent acts and intent of the New England Shoe Company and of Charles C. Davis had not been sufficiently proven to justify a decree against any of the appellees.

The New England Shoe Company was organized August 29, 1887, with a nominal capital of $50,000. During its business existence, which was a little more than two years, there were only three meetings of the directors, the first for organization, August 29, 1887, and the other two, on March 28 and December 9, 1889, to adopt certain resolutions which C. C. Davis wished to have adopted. The other two directors paid no attention to the business affairs of the company, and acted simply to carry out the purposes of C. C. Davis. The company did a small retail business, under the sole management of C. C. Davis, in a basement on the northwest corner of State and Madison streets, in Chicago. The only other business done by it or them was to make the alleged fraudulent sales and pledge hereinafter mentioned. For about two years its purchases were made mostly, if not wholly, from or through the auction and commission house of George P.

Gore & Co., in Chicago. During this time other purchases than those made from George P. Gore & Co. were made through this firm, which advanced the money to pay for them, and it deducted from the amount paid over to the manufacturer the same commission as on goods consigned to it. For about 12 years, and up to the latter part of 1888, Davis had been in the employ of Gore & Co. as a salesman and solicitor of consignments. In the latter part of 1838 he appeared to have dropped his connection with Gore & Co., and he began to make extensive purchases from manufacturers for the New England Shoe Company, independently of Gore & Co. In order to obtain credit he pretended that $30.000 of the company's capital stock had been paid in in cash, and was then in the business; that its business amounted to over $70,000 a year, and was highly profitable; that its stock on hand amounted to $25,000, and his and the company's debts to $500, all told, and that he was worth individually $38,000. By means of these representations, which were false and fraudulent, made to manufacturers and their agents, either directly or through the reports of commercial agencies, he was enabled to obtain large quantities of goods for the shoe company on credit from numerous manufacturers. Forty-three of them identified goods that they had shipped to it, and which were unpaid for, among those of which the receiver took possession in the Sibley warehouse. These goods, with some others similarly identified, and found in a loft which had been rented by the shoe company, brought at the receiver's sale $20,912.97. These goods had been recently bought, and, with the exception of perhaps $3,000 worth, were wholly unpaid for. The complainant and other intervening creditors have proved unpaid bills to the amount of between $15,000 and $16,000. About the time that the goods so ordered began to arrive, Davis began to dispose of them otherwise than by sales in the basement store. He made these sales with a studied purpose to keep the parties from whom the goods were purchased in ignorance of what he was doing. How many channels he employed for this purpose is not known. Three are clearly shown. Beginning with December 14, 1888, and ending with December 11, 1889, he sold through the auction house of George P. Gore & Co. goods, which, at their auction prices, netted $14.555.48. Prior to June 22, 1889, these sales amounted only to $1,650.94, and were made for account of Charles C. Davis individually. After that date the sales were made for account of the New England Shoe Company, and the bulk of them, amounting to $11,235.75, were made between October 1 and December 11, 1889. A comparison of the checks drawn by George P. Gore & Co. in settlement of these sales with the credit entries in C. C. Davis' bank account shows that he deposited to his individual account in the First National Bank in Chicago $9,610.75 of the proceeds of these sales, and that the payments of $1,200 and $425 in settlement of the last two sales were not deposited there. Besides the proceeds of these sales through Gore & Co., he made other large deposits on his individual account, viz: October 9th, $1,783.35; November 2d, $2,033.04; November 26th, $2,500; November 29th, $1,978.21; a total of $8,294.60. All of these deposits, except that of November 2d, correspond with payments made to Davis by Heimerdinger, through George P. Gore & Co. These goods were sold almost entirely at auction, along with other and larger consignments, some of which were on account of manufacturers. The prices obtained were fair auction prices, not jobber's nor manufacturer's prices, running sometimes as much as 20 per cent. below the prices at which jobbers ordinarily sold to retailers. The sales were quick, and somewhat forced, and prices corresponded. They were largely below the prices at which retailers could purchase from wholesale dealers.

The firm of Gore & Co. consists of George P. Gore alone, but Prouty and Heimerdinger respectively conducted, at Gore's store, business at his expense for storeroom, clerk hire, and capital, and at his risk for credit, every transaction including somewhere in its course a sale by Gore & Co. on commission. Prouty had the general management of Gore & Co.'s business, giving special attention to boots and shoes, and personally directed most of these sales. He drew a fixed salary as manager, and at the end of each year had an accounting with Gore & Co., as the result of which frequently

an additional allowance was made to him on a basis which he was unwilling or unable to explain.

Besides the $14,555.48 of sales made through Gore & Co.'s auction house, Davis, in the name of the New England Shoe Company, sold directly to Prouty, in Prouty's branch of the business, within two weeks of the failure, goods for which he received in advance $4,692.95. One purchase, consisting of 171 cases of shoes, was made by Prouty November 26th or 27th, for which he gave $3,858.48, after some bickering, in which an auctioneer of Gore & Co. was employed to make the final bargain; and the last purchase, of December 5th, within a week of the collapse, consisted of 258 cases of rubbers, for which Davis received $1,103.47. Both sales were made at low prices, and were paid for December 7, 1889. Heimerdinger, in his branch of the business carried on at the auction house of Gore & Co., made five purchases through Davis of the New England Shoe Company's goods, beginning September 17 and ending November 30, 1889, paying in all $7,310.38. Heimerdinger intimates that these purchases belonged to that class of his business which consisted in buying "bankrupt lots, and lots that go at sacrifice prices." Heimerdinger and Prouty were well acquainted with Davis, and knew the place and nature of his business. In October, November, and the first few days of December, 1889, Davis thus sold at low prices to or through Heimerdinger, Prouty, and Gore goods of the New England Shoe Company which netted him $23,509.08, and for which the company evidently was indebted in a much larger sum. To the books of account, which appear to have been of the most meager and imperfect character, no one had access except Davis himself, and they disappeared when he did. Once during the latter part of October, and again in November, 1889, for several days on each occasion, he employed Edward Stephenson, an accountant, to write up the books. On the occasion of his first service, Stephenson entered between 10 and 15 invoices of goods bought on credit, and again in November he entered 20 or more additional invoices for larger amounts than those which he had entered in October, and about two-thirds from parties who did not appear to have dealt with the company before. He estimates that these invoices amounted to between $50,000 and $60,000. All the purchases which Stephenson found there were on credit, while all the sales made by Davis were for cash. The reason assigned by Davis for making such large purchases of goods was that he intended and was endeavoring to rent a storeroom on the grade of the street, and failing to accomplish this, it became necessary to make sale of the goods.

From the Morrow Shoe Manufacturing Company, complainant, Davis bought on behalf of the New England Shoe Company, in November, 1889, $2,418 worth of goods, which were shipped to it on the 12th and 18th of November; and they have never been paid for. Intervening petitioners' have proved claims to the amount of over $13,000 for goods, the greater part of which were shipped in October and November, and are all unpaid for. These evidently constitute only a small part of the goods so ordered and received. Some of Davis' purchases were made from salesmen who came to his store, and he frequently requested them not to let other people know that he was buying of them. He made several visits to the east. Near the end of July he was in Philadelphia, where he placed an order of about $1,700, and gave a flattering, but untruthful, account of the condition and prospects of the basement store, with no allusion to any contemplated grade store. He asked Mr. Hill, to whom he gave the order, to put no marks to indicate the manufacturers, either on the goods or the boxes inclosing them. Early in November he visited the office of the Morrow Shoe Manufacturing Company in New York, and ordered goods which he said he needed for the holiday trade. He there represented that the New England Shoe Company had a paid-up capital exceeding all its liabilities, and that he personally was worth $38,000 over all his debts. A few days later he was in Boston, where he placed a number of orders, and represented that his business was prosperous.

On the 30th of October, 1889, at the New England Shoe Company's store and in the Palmer House, Chicago, in order to gain credit and to procure the Hocker-Manus Shoe Company of Cincinnati, Ohio, to manufacture and

deliver certain goods which had been previously ordered, Davis represented to an agent of the Cincinnati house that the statement he had made to a salesman was correct; that he was worth $30,000; that he owed little or nothing on his stock; that he had fully $30,000 worth of stock; that he had $2,000 worth of Chicago street-railway bonds, and $2,500 in the bank.

During the two or three months preceding the failure, Davis was rapidly filling up with shoes bought on credit a loft in the rear of 113 State street, some distance from the basement store. No business was done at this loft, to which nobody, except Davis, ever had access, except on rare occasions. He began to occupy it about May or June, but the most of the goods stored there came in within a month or two prior to December 11, 1889. Prouty was there in August, and again in October, to examine some of the goods stored there, which were offered for sale by Davis. He saw that there were more goods there in October than in August; "that the room was pretty well filled; that the rubbers were piled high, and also some of the shoes." The room was 60 feet long by about 30 feet wide and something more than 16 feet high. The cases of goods were mostly brought there on railroad trucks. About December 1st, after the large quantities taken therefrom to the auction house of Gore & Co., "the room was pretty full, boxes piled nearly to the ceiling." About the same time the stock in the basement store was gradually running down, receiving small additions, which Davis himself brought over from time to time from the loft.

In November, 1889, a traveling salesman happened to see in a retail store in Indianapolis some goods which his employer, the Heywood Boot & Shoe Company, had sold to the New England Shoe Company. The Indianapolis merchant told him that he had bought them from George P. Gore & Co. at a less price than that for which the Heywood Company had sold them to the New England Company. Upon the salesman reporting this to his employer, an attorney for some of the eastern creditors was sent to Chicago to inquire into the matter, and Davis was invited to a conference on December 4, 1889. After indulging in some abuse and vituperation, Davis stated that a little while after receiving the Heywood Company's goods he had at Heimerdinger's request, and as a matter of favor to him, let him have a small quantity of goods, including some of the Heywood manufacture, which Heimerdinger needed to fill an order from a western customer of his; that a few weeks afterwards Heimerdinger came to him, saying his western customer had refused the goods, and asking him to take them back, which he refused to do, and that Heimerdinger thereupon peddled them out for whatever he could get, and in this way some of them had probably come to the hands of the Indianapolis dealer. He referred the inquirers to Heimerdinger for corroboration. The next day, another customer, who had learned of the discovery and of Davis' explanation, called on Heimerdinger, who corroborated the story, adding that it was a trifling matter of a few pairs of shoes, only a single case, and that was the whole basis for whatever rumors might be afloat of Davis' forcing his goods off through Gore & Co.'s auction sales; and as a friend he further assured Mr. Morrow, who represented appellant, that Davis was sound and trustworthy, and that there was nothing in any rumors unfavorable to him. This story was wholly unfounded. Heimerdinger has testified to all of his transactions with Davis and the New England Shoe Company, and there is none of this kind among them. Heimerdinger, while testifying, fails to give any explanation or excuse for his repeating the next day the same fabricated story previously told by Davis. Both, on different occasions, and when apart, repeat the same story, each knowing it to be false.

Mr. Barrett, a shoemaker who worked for the New England Shoe Company, testified that somewhere along in November and December, shortly before the failure, Davis used to give him a note sometimes, and tell him to go up on Fifth avenue, and watch for Mr. Prouty coming down from Wells street depot, and to give the note to Mr. Prouty; that Davis told him not to go to Gore's, but to meet Mr. Prouty on Fifth avenue, between Madison and Wells street depot; that he did this two or three times in pursuance of instructions from Davis; that Mr. Prouty took these letters from him, and

said nothing. Mr. Prouty made no denial of these occurrences while on the witness stand, and offered no explanation.

The stock of goods in the basement store was seized by the sheriff on December 10, 1889, by virtue of two executions issued upon judgments confessed by the New England Shoe Company on the same day; one in favor of Van Weisenfluh for $5,530.33, and the other in favor of Cudworth for $5,000 and costs. Van Weisenfluh, in his testimony, describes himself as a speculator in real estate and horses, and had been employed by Peabody in his stock exchange, commonly known as a "bucket shop." Cudworth, who says his business is speculating, was, like Peabody, a creditor to a large amount of the unfortunate jewelry house of Clapp & Davies, whose affairs are under consideration by the Illinois supreme court, and was employed by Peabody to close out its stock. He declined, by advice of counsel, to answer questions touching his connection with the Clapp & Davies suit. He had known Peabody for 10 years, and he says "some might call it intimately." All three had been at one time or another in the shoe trade, and had become familiar with the Gore establishment, and also with Davis. As no appeal has been taken from so much of the decree as dismisses the bill against Cudworth and Van Weisenfluh, it is not necessary to go into the facts relating to their claim against the New England Shoe Company, or their relations with Davis. It is sufficient to say that their dealings with Peabody, Davis, and the New England Shoe Company are calculated to arouse suspicion.

On the 5th, 6th, 7th, and 9th of December, 1889, Davis' son and another young man were employed in the State street loft scraping off the names and marks from the boxes there stored, and as fast as they were thus prepared they were carried to the Hiram Sibley warehouse, on the north side, only about eight cases being left in the loft. All of the 686 packages removed from the loft to the warehouse had been sold and shipped to the New England Shoe Company. Davis took warehouse receipts in his individual name for 512 cases, and in the name of the New England Shoe Company for 174 cases only. These receipts show that the last delivery to the warehouse was made on Monday, December 9, 1889, the same day on which the attorney of Cudworth and Van Weisenfluh received from Davis, for them, the judgment notes upon which, the next day, judgments were entered, and executions were issued and levies were made on all the goods in the basement store. On Tuesday, December 10, 1889, the appellee Peabody arrived in Chicago. He had been in New York for about a week preceding. For nearly a year prior thereto he had been absent on a European tour. He reached his office about noon, and found Davis waiting for him there, with the nine receipts issued by the Sibley warehouse, and which Davis claimed covered goods worth from $35,000 to $40,000, on which he asked a loan of $20,000. After a little conversation, Peabody asked his bookkeeper if they had that amount to spare, and being informed that they had he took the receipts, and with his bookkeeper went to the warehouse, and there inspected the cases, just enough, he says, to ascertain that there were probably about as many cases as the receipts called for, and then returned to his office. He does not say whether he noticed that the names and marks were all recently scraped off the cases or not, although the evidence shows that such scrap'ng was plainly apparent. In about five minutes after his return to his office, Davis came in again, and the loan was at once agreed upon. The bookkeeper wrote out a check for $20,000, payable to the order of the New England Shoe Company. Davis took the check, and gave the New England Shoe Company's note for 90 days at 7 per cent., pledging the receipts as security, and indorsing the note as guarantor. The note authorized its holder to sell the receipts before maturity if in his opinion the securities had depreciated, and to apply the proceeds to the payment of the note and expenses. Davis then went away. Peabody left his office soon after, and went to the bank, and was at the paying teller's window while Davis was receiving $20,000 in currency for the check. His presence was noted on the check by the paying teller. Peabody claims that his presence was a mere coincidence. He says that on his way to his hotel he had stopped at the bank to call upon some of the officers

of the bank, who were his friends, and that, seeing Davis there, from a mere impulse of sociability he stepped up near to him. He claims that he did not know whether Davis was getting the cash on his check or not, nor did he make any inquiry. He admits that if he had known it was his check, he would have thought it a little irregular to draw out the currency instead of depositing the check; and if he had known that Davis kept his own account there he would have had a decided suspicion of something wrong. Peabody says that when Davis first applied for the loan he told him he wanted it in order to avail himself of a large discount which some of his creditors had offered him if he would cash their claims. He said that some of his creditors had offered him as high as 10 per cent., some as high as 13 per cent., for cash. He says that it would be an irregular way of doing to get all the currency into his hands, instead of depositing the $20,000 check, and then drawing his own checks in favor of his creditors. The form of the note was notice to Peabody that the goods which it pledged belonged to the New England Shoe Company, and not to Davis, its president. He also admits that he was so informed by Davis. The receipts for 512 cases of the goods pledged to Peabody were issued to Davis individually. Peabody did not ask nor obtain any explanation of this. He made no inquiry whether the directors of the New England Shoe Company had authorized Davis to pledge its stock in trade. As a matter of fact the pledge was never authorized by the directors. Peabody says that Davis told him that the goods pledged were not all paid for. The receipts issued to Davis individually were indorsed by him in his individual name only. Peabody admits that he was told by Davis, before the receipts were pledged to him, that all the goods covered by them belonged to the New England Shoe Company. He told the receiver that when applying for the loan Davis told him that some of his creditors were pressing him. He afterwards wished to retract this statement, and it was crossed out of the written memorandum which the receiver took down. He denied in his interview with the receiver that he had ever before loaned Davis any money, but when testifying in his own behalf he claimed that he had made him a previous loan of $5,000. Peabody admits that he had been in the basement store operated by Davis for the New England Shoe Company. Before making the loan he made no inquiries about the business of the shoe company. He says: "I asked Davis how he happened to put his goods in the warehouse; why he hadn't put them in the store. He said that he had engaged a store on State street, a large store, and had got disappointed in it, and so put them in the warehouse."

E. O. Brown and H. H. Miller, for appellant.

F. J. Smith and W. J. Foster, for appellees.

Before WOODS, Circuit Judge, and BUNN and BAKER, District Judges.

BAKER, District Judge, (after stating the facts.) It is contended by counsel for the appellant that the court below erred in dismissing the bill against the appellees for the reason that the evidence clearly shows that the New England Shoe Company and Charles C. Davis, its president, obtained large quantities of goods from the appellant and numerous other parties by means of false and fraudulent representations, without any intention of paying for the goods so obtained, and that the appellees had actual or constructive notice of the fraudulent acts and intent of the New England Shoe Company and of its president. The charges made against the appellees Gore, Heimerdinger, and Prouty by the bill of complaint, and the proofs in their support, have no immediate connection with those made against the appellee Peabody.

The case against Gore, Heimerdinger, and Prouty was tried in the court below, and has been argued here by the same counsel; while the case against Peabody was tried in the court below, and has been argued here by counsel solely representing him. It will be most convenient to follow the same course in determining this appeal.

It is suggested, rather than argued, by counsel for Gore, Heimerdinger, and Prouty, that the bill of complaint is not broad enough, even if the evidence justified it, to warrant a decree against them compelling them to account for the proceeds of the goods belonging to the New England Shoe Company which are traced into their possession. The suggestion would have deserved careful consideration if the question had been called to the attention of the court below. If the objection had been presented below, the trial court could, and in furtherance of justice, should, have permitted the bill to be amended to conform to the case made by the proofs upon such terms as were just and equitable. Neale v. Neale, 9 Wall. 1; The Tremolo Patent, 23 Wall. 518; McArtee v. Engart, 13 Ill. 242. Under the circumstances the bill ought to be treated as amended here, so far as needful, to enable the court to decide the case on its merits. The practice of presenting in the first instance in this court some alleged defect or insufficiency in the bill of complaint or answer which would have been properly amendable in the court below is not to be commended.

There is no serious controversy touching the false and fraudulent representations of Davis, as the manager and president of the New England Shoe Company, in obtaining goods from the appellant and numerous other parties, nor in regard to his intention not to pay for them, nor that the corporation was insolvent. The systematic frauds of the one and the insolvency of the other are established by the most abundant and convincing evidence. Indeed, they were not controverted by counsel for appellees, who made no attempt to deny or palliate the criminal conduct of Davis, who, upon the collapse of the New England Shoe Company, fled to Canada, presumably to avoid criminal prosecution. The purchaser who by fraud purchases goods has no protection in law against the party defrauded. The seller, on discovering the fraud, may affirm the sale and sue for the price, or he may disaffirm it, and reclaim the goods, or he may proceed criminally. Donaldson v. Farwell, 93 U. S. 631; Parrish v. Thurston, 87 Ind. 437; Gray v. St. John, 35 Ill. 239; Bowen v. Schuler, 41 Ill. 193; Hanchett v. Kimbark, 118 Ill. 121, 7 N. E. Rep. 491; Sargent v. Sturm, 23 Cal. 359; Titcomb v. Wood, 38 Me. 563; Hill v. Freeman, 3 Cush. 259; Nichols v. Michael, 23 N. Y. 266. A person obtaining goods by fraudulent pretenses is guilty of a tortious taking, and no demand for possession is necessary to enable the person defrauded to maintain replevin for them, unless they have passed to a third person, holding them bona fide for a valuable consideration, without notice. Bussing v. Rice, 2 Cush. 48; Thurston v. Blanchard, 22 Pick. 18; Butters v. Haughwout, 42 Ill. 18; Bruner v. Dyball, Id. 34;

Ryan v. Brant, Id. 78.    When no questions are asked, no false pretenses and no artifices are resorted to, mere silence is not fraud; but concealment of insolvency, with no reasonable expectation of paying, renders a sale fraudulent, and the seller is entitled to possession as against the purchaser or his voluntary assignee. Davis v. Stewart, 8 Fed. Rep. 803.

The New England Shoe Company, and Davis, its president, according to the undisputed evidence, obtained possession tortiously and wrongfully of the goods which subsequently came into the possession of the appellees.   Unless the goods came into their possession bona fide, for a valuable consideration, without notice, their possession was wrongful, and they must return the goods, or account for their reasonable value.    The appellees assert that they were bona fide purchasers for value, without notice, and that, consequently, they acquired an unimpeachable title to the goods.    It is not enough that the appellees were purchasers for value.    They must also be innocent purchasers.    The law raises this presumption in their favor, and casts the burden on the appellant to show that the appellees were guilty of participation in the fraudulent acts of Davis.    The law justly imposes on every person the duty of exercising ordinary care and prudence in his business transactions.    It imputes to him notice or knowledge of every fact which an ordinarily cautious and prudent man, in the same situation, would naturally have observed.    He may not, except at his peril, purposely or negligently omit to give heed to what is audible and visible by the exercise of ordinary care.    He must not fail to make such inquiries as an ordinarily cautious and prudent man, under the same circumstances, would have made. It follows that the appellees will be affected by the fraudulent acts and intent of Davis, if they had knowledge of them, or of the existence of such facts and circumstances as were naturally and justly calculated to awaken suspicion in the mind of an honest man of ordinary care and prudence, and lead him to inquiry.    The law is well stated by Chancellor Zabriskie:

"Any sale in which the object of the debtor that prompts and determines him to make it is to hinder, delay, or in any way put off his creditors, is void if made to any one having knowledge of his intent; and this knowledge need not be by actual positive information or notice, but will be inferred from the knowledge, by the purchaser, of facts and circumstances sufficient to raise such suspicions as to put him on inquiry."

Atwood v. Impson, 20 N. J. Eq. 156; Clements v. Moore, 6 Wall. 299; Bartles v. Gibson, 17 Fed. Rep. 293; The Holladay Case, 27 Fed. Rep. 830; Singer v. Jacobs, 11 Fed. Rep. 559; Walker v. Collins, 4 U. S. App. 406, 1 C. C. A. 642, 50 Fed. Rep. 737.

Gore, Heimerdinger, and Prouty had long been intimately associated together, all occupying and doing business in the same rooms, and with and through each other.    All their business was carried on through the books of George P. Gore & Co.    They were well acquainted with C. C. Davis, who had been employed as a salesman and solicitor of consignments in the auction house of

Gore & Co. for fully 12 years. They were acquainted with the base-ment store of the New England Shoe Company, and its business as conducted and managed by Davis. Mr. Prouty was the general manager of Gore & Co. and had almost exclusive control of the shoe business conducted by it. Heimerdinger and Prouty knew, as early as September, 1889, that Davis was storing large quantities of goods in an out-of-the-way loft on State street. They say that Davis gave as a reason why he had bought and stored in the loft such large quantities of goods that he had arranged for a grade store on State street, which he had been disappointed in securing. He gave this as the reason for selling in the course of about 60 days before the failure, to or through Gore, Heimerdinger, and Prouty, at prices below their cost, goods which netted over $23,000. This story of a grade store was accepted without inquiry or question as a sufficient explanation for the purchase and storing in the loft of goods which certainly aggregated more than $50,000 in value. They knew of the purchase and storing of these goods. They knew that Davis was selling at Gore's auction house, or to them personally, goods in large quantities, and at prices below the price for which he could obtain them from wholesale dealers. These sales were made to or through them in large quantities and in rapid succession, so that they knew, or ought to have known, that they were being made by a man anxious to convert the goods into money. Heimerdinger gave a false and fabricated account of his dealings with Davis. Prouty received letters from Davis under circumstances of suspicion, and failed to produce them, or to give any explanation of their contents. There is no evidence that Davis arranged for or engaged a large storeroom on State street, and the story was evidently devised as a part of his scheme of fraud. These facts and circumstances, with many others disclosed in the statement of the case, which were with-in the knowledge of these parties, were clearly sufficient to have put them on inquiry. The mind cannot well avoid the conclusion that if they did not know of the fraudulent purposes of Davis it was because they were willfully blind. Such facility of belief, it has been well said, invites fraud, and may justly be suspected of being its accomplice.

When the complainant learned that a few shoes, which it had sold to the New England Shoe Company, had been sold by it through Gore & Co.'s auction house to a shoe dealer in Indianapolis for less than their cost, it created such suspicion of fraud that an attorney was sent from Boston to Chicago to investigate the matter. This single fact was sufficient to create suspicion in the minds of the eastern creditors of Davis, and to cause inquiry. The numerous facts calculated to excite suspicion known to the appellees were disregarded on the pretense of Davis that he had failed to secure the storeroom which he claimed to have arranged for or engaged. When the facts and circumstances are such as to put a reasonably prudent and cautious man on inquiry, that obligation is not satisfied by an inquiry addressed to the chief actor in the suspected fraud, who has every motive for concealing the truth, when better and

more reliable sources of information are open to him. Whether these parties were guilty of actual participation in the fraudulent scheme of Davis or not, they certainly did deal in the goods obtained by fraud recklessly, and with guilty knowledge, or, which is the same thing, with knowledge of such facts and circumstances as would have put prudent and cautious men on inquiry. Heimerdinger and Prouty bought the goods of the New England Shoe Company, through Davis, under such circumstances as to charge them with knowledge of the fraud of the shoe company and its president. On the plainest principles of equity they are chargeable with the value of the goods obtained by them from Davis and the shoe company, and which they have converted to their own use. Although they may have paid the full value, and the property may have passed beyond the reach of the process of the court, equity regards them as trustees, and charges them accordingly. The cardinal principle in all such cases is that the property obtained by fraud shall not be placed beyond the reach of the party defrauded, either by the fraudulent vendee or others chargeable with the knowledge of the fraud. To permit it would be to allow the party to profit by his fraud. Clements v. Moore, 6 Wall. 299.

Gore intermeddled with these goods by selling them for Davis as an auctioneer, under such circumstances as to charge him with notice that they had been obtained by fraud, and the question remains whether such agent and auctioneer, who has sold goods and accounted for the proceeds to the guilty principal in the fraud, can be compelled to account to the parties defrauded for the goods or their value. That such auctioneer can be compelled to account to the extent of the commissions received and retained by him is settled by authority, and is not open to debate. Can he be compelled to account to the parties defrauded for the proceeds of the goods after he has accounted to the party from whom he received them? On principle, he ought to be held to account. Having sold the goods, and put them beyond the reach of the parties aggrieved, with notice of the fraud, he occupies no better situation than his bailor. He is chargeable on the principle that he knowingly aided and assisted the fraudulent vendee in depriving the vendor of the opportunity to reclaim his property. He thereby becomes a particeps criminis with the fraudulent vendee, and is liable for the value of the goods equally with him.

It is firmly settled that if an agent delivers to his principal money or property after demand and notice that they belong to another, he will be compelled to account therefor to the true owner. Payment after demand and notice is wrongful. Garland v. Bank, 9 Mass. 408; Jefts v. York, 10 Cush. 392, 12 Cush. 196. Having knowledge that the goods had been obtained by fraud, it became the duty of Gore not to meddle with them, or, having received them, to retain them or their proceeds for the benefit of the true owners. Equity regards the fraudulent vendee as holding the goods in trust for the party defrauded. It has been held, where an agent aids a trustee in making or procuring the conversion or un-

authorized transfer of property held in trust, that he is liable for the loss sustained by the cestui que trust, although he acted in the matters of the agency without benefit or profit to himself. Caulkins v. Gaslight Co., 85 Tenn. 683, 4 S. W. Rep. 287. A fortiori, the agent who, with notice of the fraud, aids the fraudulent vendee in putting the property beyond the reach of its true owners, ought to be liable for the value of the property thus wrongfully diverted. Hoffman v. Carow, 20 Wend. 22; Id., 22 Wend. 285; Mechem, Ag. § 915. This case does not fall within the principle which ruled the cases of Lamb v. Stone, 11 Pick. 527; Wellington v. Small, 3 Cush. 145; Bradley v. Fuller, 118 Mass. 239; Tasker v. Moss, 82 Ind. 62, and Blair v. Smith, 114 Ind. 114, 15 N. E. Rep. 817. These cases hold that a creditor who has no interest in nor lien upon the property of his debtor cannot maintain an action at law against a person who has accepted a conveyance of the debtor's property for the purpose of defrauding the creditor, after such fraudulent grantee has conveyed the property to another at the instance and for the benefit of the debtor, without retaining any portion of it, or receiving any benefit from it. In such cases it is held that the injury complained of is too remote, indefinite, and contingent. The property belonged to the debtor, and the creditor had no special property or interest in nor claim on the property fraudulently conveyed which could be injuriously affected or destroyed by the act of the fraudulent grantee. The most that the creditor can claim in such a case is that he intended to attach or levy on the property, and that the wrongful act of the fraudulent vendee has prevented him from executing his intention. This is an injury so remote, uncertain, and contingent, that it affords no ground for relief in an action at law. In the case at bar the property had been obtained by fraud from the creditors who are prosecuting this bill, and Gore, with knowledge of that fact, accepted it, and for his own profit sold the goods at auction, thus placing them beyond reclamation. Here the creditors in equity and good conscience remained the owners of the property, which he wrongfully sold and converted. While the bill is filed by a single creditor, the suit is brought and prosecuted for the benefit of all the creditors whose property was obtained by fraud; and in this property thus obtained the creditors have such special title and interest in common as to enable them to charge every person as trustee who has wrongfully dealt with it with knowledge of the fraud. Gore must, therefore, account for the goods received by him from Davis on account of the New England Shoe Company, which were sold by him as auctioneer.

Peabody invokes for his protection the claim that he received the warehouse receipts covering from $35,000 to $40,000 worth of goods in good faith to secure a loan of $20,000 made by him to the New England Shoe Company. The evidence shows that Peabody was a man of large and varied business experience. At different times in his life he had been engaged in dealings in bucket shops, in buying boots and shoes, in purchasing jewelry from failing concerns and at bankrupt sales, while at and for some time before the trans-

actions in question he was a capitalist engaged in loaning money. He had been acquainted with Davis for 20 years. He had visited the basement store of the New England Shoe Company, and did not know of its having any other. He testifies that at one time he had loaned Davis $5,000, but previously, in an interview sought by him with the receiver of the New England Shoe Company, he denied that he had ever previously loaned Davis any money. He arrived in Chicago on the 10th day of December, 1889, and went immediately to his office, where he found Davis awaiting him. Davis had visited Peabody's office a number of times within a few days preceding his return, and in conversation with his confidential clerk and bookkeeper had expressed anxiety to see Peabody. Davis at once told Peabody that he wanted to borrow some money, and he exhibited the nine warehouse receipts on which he asked a loan of $20,000. After a little conversation, Peabody asked his bookkeeper if he had that amount to spare, and, on being informed that he had, he took the receipts, and with his bookkeeper went to the warehouse, and inspected the cases of goods, and returned to his office. The goods were in the original cases, and the names and marks had all been recently scraped off from the cases. The evidence shows that the scraping was fresh, and plainly apparent, and must have been observed by any one giving the least attention. In about five minutes after his return to his office, Davis called again, and the loan was at once agreed on. The bookkeeper wrote the check for $20,000, payable to the order of the shoe company. Davis took the check, and gave the shoe company's note for 90 days at 7 per cent., pledging the receipts as security, and indorsing the note as guarantor. The note authorized its holder to sell the receipts before its maturity if, in his opinion, the securities had depreciated, and to apply the proceeds to the payment of the note and expenses. Peabody was present at the bank when Davis drew $20,000 in currency on the check. When Davis applied for the loan he told Peabody that he wanted it to avail himself of a large discount which some of his creditors had offered him if he would cash their claims. Peabody told the receiver that when Davis was asking for the loan he stated that some of his creditors were pressing him. Before making the loan he made no inquiry concerning the business or condition of the shoe company. He asked Davis how he happened to put his goods in a warehouse, and claims that Davis told him that he had engaged a large store on State street, and had been disappointed in getting it, and so had put them in the warehouse. The foregoing facts, with others disclosed in the statement of the case, raise a strong suspicion against the bona fides of the transaction between Davis and Peabody. His statement to the receiver that he had never loaned Davis money on any former occasion is proved to have been untrue by his own admission under oath. A false statement is always suggestive of fraud. He knew that Davis was being pressed by his creditors, and was urgent to secure money by pledging goods, which he knew were not paid for. The large quantity of goods, the place of their deposit, the defacing of all

marks from the original packages, the pretense of Davis that he had engaged a large storeroom, which he had failed to secure, the transfer of nearly $40,000 worth of goods on such terms as precluded their redemption, and the failure to make any inquiry are a few of the circumstances, calculated to create a strong doubt of the integrity of the transaction between Davis and Peabody. "They threw on Peabody the duty of making a full explanation, and the burden of proof to sustain it." Clements v. Moore, 6 Wall. 299, 315; Piddock v. Brown, 3 P. Wms. 289; Wharton v. May, 5 Ves. 49; Zook v. Simonson, 72 Ind. 83. He has wholly failed to produce any evidence to relieve the transaction of the strong doubts of its integrity which surround it. The title of his pledgor was fraudulent and voidable, and, if Peabody is to be permitted to defeat the prior rights of the parties defrauded by Davis, it can only be done when on the whole evidence it is made to appear that he was a bona fide purchaser for value. If, on the whole case, strong doubts of the integrity of the transaction exist, the prior rights of Davis' creditors will prevail.

The evidence makes a case which fully satisfies us that the proceeds arising from the sale of the goods pledged by Davis must, so far as necessary, be applied to the payment of the appellant's claims. It is urged that the exigencies of business in great commercial centers justify less inquiry into the title and ownership of personal property offered for pledge or sale than would be exacted elsewhere. If good faith and honest dealings are to be maintained, if business is not to degenerate into robbery, the courts must with unflinching hand strip the mask of hypocrisy from the face of fraud, whether practiced in city or hamlet. The transactions of great commercial centers furnish abundant facilities for the practice of fraud, and courts ought to scrutinize them with a jealous solicitude to defeat the wrong, and to vindicate the right.

The bill fails to allege that the plaintiff had prosecuted its claim to judgment, and had issued an execution thereon, and had the same returned nulla bona. For this reason the bill of complaint is insufficient within the doctrine of Scott v. Neely, 140 U. S. 106, 11 Sup. Ct. Rep. 712, and Cates v. Allen, 149 U. S. 451, 13 Sup. Ct. Rep. 883, 977.

It is therefore adjudged that the decree herein be reversed, but at the costs of the appellant, and that the cause be remanded to the court below, with leave to the complainant to amend its bill of complaint within 30 days after the judgment herein shall be certified to the court below; and, if the complainant shall fail to amend its bill of complaint within the time herein allowed, the same shall be dismissed without prejudice.

BUNN, District Judge, (dissenting.) I am unable to concur in the conclusions reached by a majority of the court in this case. I think the evidence hardly more than sufficient to raise a suspicion of fraud as against the appellees, without proving its existence, and that the decree of the circuit court should be affirmed.