In re HUNTER–RAND CO.

Petition of ARMSTRONG, CATOR & CO.

(District Court, E. D. North Carolina. March 21, 1917.)

No. 537.

1. EQUITY ⬤⟳12—JURISDICTION—FRAUD—LEGAL DEFENSE—EQUITABLE RE-LIEF.

Fraud, to be available as a defense in a legal action, must be fraud in the factum; when it is committed in the negotiation, equity is the proper tribunal to grant relief.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 22.]

2. FRAUD ⬤⟳3—ELEMENTS—MISREPRESENTATIONS.

A remedial "fraud" is a representation, express or implied, false within the knowledge of the party making it, reasonably relied upon by the other party, and constituting a material inducement to the contract or act.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 1.

For other definitions, see Words and Phrases, First and Second Series, Fraud.]

3. FRAUD ⬤⟳16—MISREPRESENTATIONS—NONDISCLOSURE.

While misrepresentation may be implied from conduct, mere nondisclosure is generally not equivalent to fraud, unless the disclosure of the fact was a legal duty.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. § 15.]

4. SALES ⬤⟳45—RESCISSION BY SELLER—FRAUD—INTENTION NOT TO PAY.

A conceived purpose by an insolvent buyer, purchasing goods on credit not to pay for them renders the sale invalid at the option of the seller, either on the theory that there was no meeting of the minds of the parties or that securing possession of the goods without intention to pay for them is a fraud on the seller, entitling him to rescind.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 94.]

5. SALES ⬤⟳46—RESCISSION BY SELLER—FRAUD—REPRESENTATION AS TO SOLVENCY.

When an insolvent buyer, by a fraudulent representation as to his financial condition, induces the seller to sell the goods on credit, the fraud entitles the seller to rescind the contract.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 95.]

6. SALES ⬤⟳52(7)—RESCISSION BY SELLER—FRAUD—INTENTION NOT TO PAY—PROOF.

The intention of the buyer not to pay for goods ordered is a fact to be ascertained from competent and relevant testimony, and proof that he was at the time of purchase hopelessly insolvent, having no reasonable ground to expect that he could pay the contract price, which fact he did not communicate to the seller, is sufficient to sustain the conclusion that he had no intention to pay.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 140–144.]

7. SALES ⬤⟳52(1)—RESCISSION BY SELLER—FRAUD—BURDEN OF PROOF—INTENTION NOT TO PAY.

The burden is on the seller, who seeks to recover the property on the ground that the buyer did not intend to pay therefor, to prove such intention; there being no presumption either way.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 118–123, 1045.]

8. SALES ⬤⟳52(7)—FRAUD—EVIDENCE—PURCHASE WITH INTENT NOT TO PAY.

On petition to review an order of the referee in bankruptcy denying petitioner's right to goods sold to the bankrupt corporation shortly before

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

its bankruptcy, evidence *held* not to show that the officers of the corporation, who had become personally liable for some of the corporation's debts, and who testified they thought their liability released the corporation, so they did not consider those debts in determining the corporation's solvency, knew that it would be impossible to pay for the goods, so as to warrant an inference that they had no intention to pay for them when they purchased them.

[Ed. Note.—For other cases, see Sales, Cent. Dig. §§ 140–144.]

In Bankruptcy. In the matter of the Hunter-Rand Company, bankrupt. On petition by Armstrong, Cator & Co. to review the referee's findings of fact and law on a petition to recover possession of goods alleged to have been procured by the bankrupt by fraud. Judgment of the referee affirmed.

John W. Hinsdale, of Raleigh, N. C., for creditors.
J. C. Little, of Raleigh, N. C., for trustee.

CONNOR, District Judge. The referee found the following essential facts:

On several dates between March 28, 1916, and April 25, 1916, inclusive, the bankrupt, a mercantile corporation, conducting its business in Raleigh, N. C., ordered and received from petitioners, Armstrong, Cator & Co., wholesale merchants conducting business in the city of Baltimore, Md., goods and merchandise invoiced at the aggregate sum of $697.18. The goods were sold upon the usual terms in regard to credit, prevailing in the trade. The largest invoice amounted to $299.15, April 18, 1916, and the smallest $3.60, March 31, 1916; the other invoices ranged between $215.01 and $21. The goods were received by the bankrupt in the usual course of business and trade, placed in its store, and mingled with its other stock. At the time the sales were made by Armstrong, Cator & Co., the Hunter-Rand Company owed debts amounting to $44,557.13 and had a stock of merchandise inventoried at $26,351.86, and accounts, which the managing officers thought "collectible," amounting to $14,934.41. At a "forced sale" the goods were worth about 50 cents on the dollar. The amount "collectible" on the accounts would not exceed $3,500.

"No evidence has been offered by Armstrong, Cator & Co. of any false financial statement made to it by the bankrupt, nor is there any evidence of fraud or deceit on the part of the bankrupt in connection with the above sales of goods on credit."

The Hunter-Rand Company was adjudged bankrupt May 5, 1916. The portion of the goods purchased from Armstrong, Cator & Co., which had not been sold by the bankrupt, was received by the trustee, and was in his possession when this petition was filed. At cost they amount to $370.54.

The referee, upon the foregoing facts, found as conclusion of law that the goods were sold on credit, with open account; no false representations, as to financial condition, were made by the bankrupt, and there is no evidence whatever of any fraud; therefore the petitioners are not entitled to recover the goods identified in the hands of the trustee. The petition was dismissed.

Petitioners filed a petition for review, assigning as error the failure of the referee to find, as a fact:

"That Hunter-Rand Company, at the time of the purchase of the merchandise in question, knew that the said company was hopelessly insolvent, and that it purchased the said merchandise with no intention of paying for the same, and that there was no fraud on the part of the bankrupt in connection with the sale of the said goods on a credit; the petitioners having no information of such fact."

Petitioners assign as error in the conclusion of law, that the referee held that petitioners were not entitled, on all of the evidence, to rescind the sale and reclaim the goods. There was no conflict in the testimony in respect to the conditions under which the goods were ordered and sold. While the referee did not specifically find that the managing officers of the bankrupt corporation knew its financial condition, it must, in the light of the evidence, be taken that they knew the amount and character of its indebtedness and its assets. While, in legal contemplation, this condition shows insolvency (that is, inability to pay its debts by the sale of its stock and collection of its credits), this is not determinative of the question upon which the right to rescind by the petitioners depends. The referee finds that, at the time the goods were received, and this is assumed to cover the entire period, March 21, 1916, to April 28, 1916, the Hunter-Rand Company was "totally insolvent." He evidently did not intend to find that it had no property applicable to the payment of its debts, but that it was unable to pay its debts in full, and in this condition of its affairs the corporation was insolvent.

Total insolvency would give a different coloring to the transaction. If one obtained property by promising to pay therefor at some future time, being "totally" without any means of doing so, which fact he failed to communicate to the seller, in the absence of explanation, a strong presumption of an intention not to pay for it would arise, in a normal mind. The degree or extent of the insolvency of the purchaser constitutes an important factor in ascertaining his intention in regard to paying for property purchased on credit. The petition filed by Armstrong, Cator & Co. sets forth very clearly the basis of their claim to rescind the sale and reclaim the goods. They say, in substance, that on the dates named they "sold and delivered" to the bankrupts the goods, at the prices named, set forth in the exhibits attached, being copies of the invoices; that at the dates of said sales the Hunter-Rand Company "was hopelessly insolvent," did not have sufficient assets to pay more than 20 per cent. of its indebtedness, giving petitioners' estimates of indebtedness and assets, which are substantially correct; that nothing occurred between the dates of the sales and the bankruptcy "to explain or account for its being in a worse condition now than at the time the said goods were purchased; that under all these circumstances the bankrupt must have been aware of its condition when the said purchases were made, and that it was utterly impossible to pay its debts in full"; that petitioners were ignorant of these facts until the petition in bankruptcy was filed.

[1] The question presented is interesting, and its correct decision

not free from difficulty. The right of a party, who has been induced to enter into an executed contract by fraudulent representations, to invoke the equitable power of a court of chancery to cancel or rescind it, is of ancient origin and has well-defined limitations. The right to use, as a defense in an action at law brought for the enforcement of an executory contract, the fraud of the plaintiff, is also recognized, and within its limitations enforced. It has been said that fraud, which is available as a defense in such action, must be found in the factum; whereas, when the fraud against which relief is sought, is committed in the treaty or negotiation, a court of equity is the appropriate tribunal to grant relief. This is elementary, although it is sometimes uncertain upon which side the line of demarcation a given case falls. The distinction, with the jurisdictional line of division, is clearly pointed out and illustrated by Pearson, C. J., in Lee v. Pearce, 68 N. C. 76. Since the adoption, by many of the states, of the code system, wherein the distinction between actions at law and suits in equity has been abolished, and all actionable wrongs and legal and equitable remedies are administered in a civil action, the distinction has become of less practical importance, although in federal courts it still obtains.

[2] A remedial fraud, without regard to the forum in which it is being dealt with, has been defined to be:

"A representation, expressed or implied, false within the knowledge of the party making it, reasonably relied upon by the other party, and constituting a material inducement to his contract or act." Adams, Eq. 176.

[3] This definition, while for practical purposes it is accurate, yet leaves open many questions which have given the courts much trouble. Mr. Adams says:

"When no statement has been expressly made, a misrepresentation may nevertheless be implied from conduct. But mere nondisclosure is generally not equivalent to fraud."

This, of course, involves the question whether disclosure of a fact, within the knowledge of the party charged with the fraud, the existence of which may reasonably be assumed to be unknown by the other party, is a legal duty, and this opens up a wide range of inquiry.

[4] The principle upon which the right to recover the property is based is that, because of the fact that the defendant procured its possession, having no intention of paying the price, either at the expiration of the period of credit or at any other time, the title did not pass out of the owner and into the defendant. The principle is elementary, but its application to sales of personal property appears to be of modern origin, and its limitations not very clearly marked. Sir Frederick Pollock says:

"It has been said that it is not fraud to make a contract without any intention of performing it, because peradventure the party may think better of it and perform it after all; but this was in a case where the question arose wholly on the form of the pleadings in a highly technical and now happily impossible manner. Hemingway v. Hamilton, 1 M. & W. 115. Both before and since that time it has repeatedly been considered a fraud in law to buy goods with the intention of not paying for them. Here it is obvious that the party would not enter into the contract if he knew of the fraudulent in-

tention; but the fraud is not so much the concealment, as in the character of the intention itself." Contracts (2d Am. Ed. Wald.) 512, 513.

The American editor' cites in the note a number of American and English cases. Mr. Page says:

"When the promise is made, without any intent on promisor's part to keep it, but to induce action on the promisee, it is held in many jurisdictions to be fraud, on the theory that the intent of the party promising is a material fact." Page on Contracts, 102.

It is evident that some courts have adhered, rather too closely, to the language used in the older cases, and writers, that to constitute a remedial fraud there must be a false statement in regard to a fact, as distinguished from the expression of an opinion, an inference, or a promise to do something in the future; failing to note that intention, the state of the mind, is as essentially a fact, as a great English judge said, was the state of a man's digestion. Page says:

"An application of the doctrine that a promise made, without the intention of keeping it, is found in the purchase of goods on credit. If one buys goods on credit, intending not to pay for them, this is held fraud, distinct from any false representation as to solvency." Section 103.

For the last branch of this proposition, he cites cases from Arkansas, Indiana, and Kentucky. Mr. Wald, in the note to Pollock on Contracts, says:

"The nondisclosure by a purchaser of his insolvency does not alone amount to fraud"—citing cases from New York and several other states.

The only case found in the Supreme Court Reports, dealing with the question, is Donaldson v. Farwell, 93 U. S. 631, 23 L. Ed. 993. To have a clear understanding of the full import of the decision, reference to the facts is necessary. The action was brought by defendants in error against the plaintiff in error, assignee of one Mann, a bankrupt, for the recovery of goods sold to him within a month prior to his adjudication. The purchase was made by Mann's son, as his agent, who testified that his father was engaged in business at Richfield, Wis. The son directed the goods to be shipped to Milwaukee, stating that it was his intention to have them shipped to Milwaukee and to have them "hauled to Richfield." He knew that his father was then, and had been for two or three years before, insolvent. He testified, on the trial, that at the time of the purchase he did not expect that his father would pay for the goods, that he did not expect to pay for them himself, and that his object in having them sent to Milwaukee was to place them in the hands of one Schram, in order that they should then be disposed of and the proceeds paid to some creditors of his father, who had sold him produce and advanced him money. The goods were shipped to "E. Mann, Milwaukee," and, on their arrival, sent to Schram. The owners of the goods had no notice of the insolvency of Mann until the last days of May. Upon this testimony, the court instructed the jury that a defeasible title to the goods passed to the bankrupt, subject to the right of the defendant in error to reclaim them. Mr. Justice Davis, approving the instruction, and affirming the judgment for the owners of the goods, said:

"The doctrine is now established by a preponderance of authority that a party not intending to pay, who, as in this instance, induces the owner to sell him goods on credit by fraudulently concealing his insolvency and his intent not to pay for them, is guilty of a fraud which entitles the vendor, if no innocent third party has acquired an interest 'in them, to disaffirm the contract and recover the goods"—citing several cases and Benjamin on Sales.

In that case the intention, existing in the mind of the buyer's agent, not to pay for the goods, was admitted by him; no statement was made in regard to his financial condition, nor was any statement in regard to any other fact made, the agent stating that he intended to have the goods hauled from Milwaukee to Richfield, where his father was engaged in business; he admits that he had no such intention, but, on the contrary, intended that, when they reached Milwaukee, they would be delivered to one Schram, etc. Mr. Justice Davis, upon the evidence in this case, regarded the two essential factors upon which the right of the buyer to rescind the sale were the fraudulent concealment of insolvency and the intent not to pay for them. He evidently regarded the false statement, that it was the intention of the agent, in directing the shipment to Milwaukee, to have them hauled to Richfield, as a fraudulent concealment of the insolvency of his father, because there was no other evidence of this fact, and this may well have been so interpreted by the jury. The decision would seem to be authority for the proposition that when, at the time the sale was made, the purchaser did not intend to pay, and there was a fraudulent concealment of his insolvency, the owner was entitled to rescind the contract and reclaim the goods.

Whether the intention in the mind of the buyer not to pay, uncommunicated to the seller, entitles him to treat the sale as void because the minds of the parties never came together, or whether such intention is a fraud upon the seller, which entitles him to rescind the contract of sale, or, as said in the Farwell Case, renders the sale defeasible at the option of the seller, is probably more interesting than practical. In Donaldson v. Farwell, supra, the buyer was relieved of the necessity of proving the intention by the admission of the agent of the buyer. Whether the court would, upon the admission of an intention not to pay without the false statement in regard to the proposed hauling from Milwaukee to Richfield, have sustained the right to rescind the sale, is conjectural. In Turner v. Ward, 154 U. S. 618, 14 Sup. Ct. 1179, 23 L. Ed. 391, the court affirmed a decree in equity rescinding a sale of personal property upon the statement that the purchaser was solvent, whereas, in truth, "the firm was largely in debt, and in less than 60 days * * * made an assignment." There was no suggestion of an undisclosed intention not to pay. No authorities are cited.

"Mere insolvency of the buyer and failure to disclose it are not sufficient grounds for rescission, unless coupled with an intention not to pay for the goods, or the absence of any reasonable expectation of doing so." 24 Am. & Eng. Enc. 1100.

In German Nat. Bank v. Princeton State Bank, 128 Wis. 60, 107 N. W. 454, 6 L. R. A. (N. S.) 556, 8 Ann. Cas. 502, the trial court

found, as a fact, that the party charged with the fraud was insolvent, which fact he did not disclose —that he made no representation in regard to his financial condition. The appellant insisted that his financial condition, at the time of the transaction, showed that he could have had no reasonable expectation of being able to pay, and therefore the court should have found that he had a definite purpose not to pay, whereas the court found, as a conclusion of fact, that he did not have the definite purpose not to pay, when he obtained the property. Winslow, Justice, in a well-considered opinion, clearly states the two grounds upon which the injured party has the right to rescind a contract of sale. He says:

"It is well settled that a sale of property may be set aside as fraudulent, either (1) because it was induced by false and fraudulent representations which were relied upon by the seller; or (2) because of the existence of an undisclosed intention not to pay on the part of the buyer. These are two separate and distinct wrongs: The first is complete without intent not to pay; the second is complete without false representations. Both may be present in a given case, but either is complete and actionable without the other."

This I think an accurate and correct statement of the law. In that case the finding of the judge that there was no false representation, being affirmed, left the question open whether, upon the evidence, the trial court should have found an intention on the part of the buyer not to pay, because of the fact of insolvency. The learned justice, upon this question, said:

"The law is settled that mere insolvency is not sufficient to prove intent not to pay; neither is a mere failure to disclose such insolvency, when not interrogated. The buyer may hold his peace, if he is not asked; otherwise, the door of hope would be wellnigh closed to the struggling merchant whose liabilities exceed his assets. If there be an honest purpose to pay, undisclosed insolvency does not affect the validity of the transaction; there must also be a preconceived purpose not to pay."

In the very exhaustive note to this case, the principles announced by the court are sustained by the weight of the decided cases. In Gillespie v. Piles, 178 Fed. 886, 102 C. C. A. 120, 44 L. R. A. (N. S.) 1, Judge Sanborn says:

"It is conceded that the insolvency of a purchaser does not prove his intent not to pay for the goods which he buys."

This is sustained by a wealth of decided cases cited in the notes, and I think may be regarded as "settled law."

There is, however, another viewpoint from which petitioners insist that they are entitled to recover the possession of the goods claimed by them. While there was no false statement made for the purpose of securing the goods, they contend that it appears from the undisputed evidence that, on March 21, 1916, and for a long time prior thereto, and until April 28, 1916, during which periods Hunter-Rand Company was ordering the goods, it was hopelessly insolvent, and that there was no change in its financial condition between these dates and May 5, 1916, when it was adjudged bankrupt; that during these periods the corporation was hopelessly insolvent, and had no reasonable ground to base an expectation of ability to pay; that false and fraudulent

representations in respect to its financial condition were made to other parties for the purpose of obtaining the possession of goods, and upon which goods were obtained; that from these conditions the only reasonable inference to be drawn is that it had no intention of paying for the goods purchased from petitioners. The principle invoked by petitioners is stated by Judge Sanborn in Gillespie v. Piles, supra. Referring to the facts developed in that case, he says:

"In this state of the case it is incredible that he [the buyer] intended to pay for these hogs when he bought them. He knew it was impossible for him to pay for them, and the human mind is so constituted that it cannot harbor a serious intent that the being it directs shall do that which it knows it is impossible for it to accomplish. An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it."

In Maxwell v. Brown Shoe Co., 114 Ala. 304, 21 South. 1009, it is said:

"A sale and purchase of goods is fraudulent, and open to disaffirmance by the seller when the purchaser was at the time thereof insolvent, or in failing circumstances, and had the design not to pay for them, or had no reasonable expectation of being able to pay for them, and either represented that he was solvent, or intended to pay, or had reasonable expectation of being able to pay, or failed to disclose his financial condition, or the fact that he did not intend to pay, or expect to be able to pay, for the goods."

This is held in several Alabama cases. While the authorities are not uniform in respect to the last phase of the question, the law is well stated in Hall v. Naylor, 3 N. Y. Super. Ct. 71, in which it is said:

"If, at the time of a credit purchase, the party is hopelessly insolvent, and knows it, and such purchase is speedily followed by a transfer of all his property for the payment of his debts, evidence may be admitted of other transactions with, or other declarations to, different parties, about the same period, tending to the conclusion of a general design to defraud creditors by fraudulent purchases." Jordan v. Osgood, 109 Mass. 457, 12 Am. Rep. 731.

In Johnson v. Monell, *41 N. Y. 655, it was held that when purchases were made by an insolvent who six days thereafter made an assignment, without any satisfactory explanation, this was evidence from which an inference might be fairly drawn that, at the time the purchases were made, the party had no reasonable expectation of being able to pay for them, and, from this conclusion, the further conclusion could be reasonably drawn that he did not intend to do so. In Whitten v. Fitzwater, 129 N. Y. 626, 29 N. E. 298, at the time the purchase was made, the buyer knew that he was insolvent, and would not be able to pay for the goods; he made an assignment 15 days after receiving the goods. It was held that the seller could disaffirm the sale and recover the goods. It is stated in Perlam v. Sartorius, 162 Pa. 320, 29 Atl. 852, 42 Am. St. Rep. 834, that the rule in Maryland is that if a person buys goods, knowing that he is insolvent and

having no reasonable expectation of paying for them, the purchase is void and no title passes. It is said that the courts of Pennsylvania hold that a false representation or artifice is essential to a recovery of the goods, although it is also held that known insolvency, with no reasonable expectation of ability to pay, is sufficient to take the case to the jury on the question of intention. The Supreme Court of this state holds that insolvency, without a false representation, will not entitle the seller to rescind the sale. Wilson v. White, 80 N. C. 280; Des Farges v. Pugh, 93 N. C. 31, 53 Am. Rep. 446, although in the last case no express representation as to solvency was made. The element of the absence of reasonable expectation of ability to pay has not been discussed by our Supreme Court.

[5-7] I am of the opinion that a reasonably correct conclusion, to be drawn from the numerous and somewhat conflicting decisions, may be stated: (1) A conceived purpose by an insolvent person, purchasing personal property on credit, not to pay for it, renders the sale invalid at the option of the owner. This result is reached either upon the theory that, because of the state of mind of the buyer, there was no coming together of the minds of the parties, or that getting the possession of the property with the intention not to pay for it is a fraud upon the seller, entitling him to rescind. (2) When the buyer is insolvent, and, by a false and fraudulent representation in regard to his financial condition, conceals the truth from the seller, and thereby induces him to sell to the buyer personal property on credit, such fraud entitles the seller to rescind the contract. The state of mind, the intention of the buyer, is a fact to be ascertained by competent and relevant testimony, so that, when it is shown to the court that he was, at the time of making the purchase, hopelessly insolvent, having no reasonable ground upon which to base an expectation of ability to pay the contract price, this condition, known to him and uncommunicated to the seller, is sufficient evidence of an intention not to pay, to sustain the conclusion that, when he purchased the property, he had the intention not to pay. I do not think that there is any presumption either way, but that the ultimate fact in issue, the intention of the buyer, must be ascertained by a consideration of all of the relevant testimony submitted to the trier of the fact. The burden of proof is upon the buyer, who seeks to recover the property.

[8] While the conduct of an insolvent unfortunate buyer should not, upon insufficient evidence, be denounced as fraudulent, at the same time a fair, just rule of law, which protects the seller from being deprived of his property and the price thereof, when using the usual degree of care and trusting to the usual standard of commercial integrity, can work no injustice to either party. The evidence, taken by the referee, tends to show that the Hunter-Rand Company is a corporation organized pursuant to the laws of this state, for the purpose of conducting a general mercantile business, as indicated on its letter heads, in "dry goods, notions and shoes," with a "capital stock of $17,000," as represented in its "statements" sent out to those from whom it purchased goods. It had been engaged in business about four years. Four thousand dollars of its capital stock, owned

by the guardian of one of its original stockholders, who died a few years ago, had been purchased by the corporation and its note given therefor. Several of the stockholders were brothers and kinsmen. They had but little experience, and capacity, for that which they were undertaking. They were men of good character and honest purpose; that is, they hoped and expected the business to be successful. Their optimism dominated and controlled their judgment.

It is' difficult, looking over the wreck disclosed by their bankruptcy, to understand how they could have thought, after January 1, 1916, that it was possible for them to continue in business or pay their debts, and yet their conduct, in many respects, leads to the conclusion that they did so. Several of the stockholders mortgaged their individual property as security for loans made by banks to the corporation for money which was used in the business. They made statements to persons, other than Armstrong, Cator & Co., from whom they were buying goods, which were unquestionably false. These statements were made annually and sent out by them. They were based upon inventories of stock taken at the beginning of each year and reports to the directors made by the credit man and bookkeeper. In regard to the assets—stock, open accounts, and other property—there is no suggestion of falsity; but in each statement up to, and including, January 1, 1916, the indebtedness in the last statement was placed at $15,365.61, whereas, the corporation owed May 4, 1916, $44,557.13, which amount was but little in excess of its indebtedness January 1, 1916.

By reason of the false statement, in respect to the amount of its liabilities, made by the secretary and treasurer of the corporation, its apparent net worth was $30,278.33; whereas, upon a correct statement of its liabilities, it would have shown no surplus. This statement was sent to several parties and firms with whom the corporation was dealing, and from whom it was buying, and continued to buy, goods up to a few days before it filed the petition in bankruptcy. It further appears that, on April 12, 1916, the secretary and treasurer, also a stockholder, sent to Craddock-Terry Company, Lynchburg, Va., with an order for goods, a statement made up as of January 1, 1916, containing an itemized list of liabilities, showing $15,365.61. On April 12th Craddock-Terry Company returned the statement, calling attention to the fact that the items aggregated only $14,165.61, asking an explanation, to which an answer was sent containing "completed statement," concluding:

"Please ship goods in accordance with above, and we will sign and return notes on receipt. The error in other statement was due to oversight."

The "completed statement" contained list of liabilities aggregating $15,365.61, whereas it is conceded that the corporation then owed $44,517.13. Upon this statement Craddock-Terry Company, on April 20, 1916, shipped goods amounting to $596.27. On March 21, 1916, the corporation, on the faith of the same statement, purchased goods to the amount of $446.10 from Watts Bros. Company. On March 21 and April 3, 1916, the corporation purchased on credit, making no statement, 23 sewing machines from the Free Sewing Machine

Company, for which they made no payment. The machines were on hand and are in the possession of the trustee. Neither of these statements having been made to petitioners, they are relevant only upon the inquiry of the intention or state of mind of the officers of the Hunter-Rand Company. The secretary and treasurer says that a number of these statements were sent out to creditors as "a basis of credit." The stock of merchandise was ascertained by inventory, January 1, 1916. The accounts were "taken" from the ledger, including those which were thought to be collectible and noncollectible. When asked why the amounts, which were owing to "the banks and other persons" were omitted from the statement, he answered, "We were personally responsible for that"—that he did not know that the personal liability did not release the corporation; never thought about it; knew that, if paid by the indorsers, they would hold them against the corporation; did not include them "because I thought we were personally responsible for them, and it made no difference, as we were in the corporation." This appears to have been the view of each of the officers.

The debts omitted from the statements were due the banks and others for borrowed money, and a note of $4,000, due Mrs. C. N. Hunter, guardian for the children of George Hunter, deceased, given for the stock held by her to the corporation. The stockholders were indorsers of each of these notes, and for some of them mortgaged their lands. While to an intelligent business man, or lawyer, the reason assigned for omitting from the liabilities these debts savors of a degree of ignorance taxing credulity, yet I am constrained, in the light of all of the evidence in this case and observation of the conduct of inexperienced business men, to accept their statement as true—that is, that such was their mental attitude. This conclusion is sustained by the fact that, in the annual statements, made for three years prior to 1916, the same method was observed. It will be noted that, in the statement of liabilities, the language used is, "Bills due and not due for merchandise," or "Accounts payable, due and not due." The only statement in which the liabilities are itemized is that made to Craddock-Terry Company on the blank furnished by them.

While it is probable that, by reason of the inexperience and lax method of conducting the business, the Hunter-Rand Company was doomed to ultimate failure, it is clear that the stockholders, who owned and managed it, did not understand or foresee its fate. The sales, prior to 1914, were large and the profits fair; its expense was too large, but, so far as appears, it seemed to have "smooth sailing." The good faith of the stockholders and their confidence in the success of the enterprise was shown in their willingness to pledge their individual credit, and, for the purpose of borrowing money for the benefit of the corporation, mortgage their individual property. Upon the death of their brother, several years ago, the remaining stockholders bought his stock, giving their note for the full value thereof. Except the omission to give a correct statement of its liabilities, as explained by them, I do not find any conduct on their part inconsistent with an honest purpose, coupled with excessive optimism.

Upon a careful examination of the entire evidence, and anxious consideration of the case from every viewpoint, I am unable to find as a fact that the goods purchased from petitioners were ordered and received by the officers and managers of the corporation with an intent not to pay for them. I am impressed with the language of the court in Powell v. Bradlee, 9 Gill & J. (Md.) 220, said to be "one of the leading American cases." To the request for a prayer, declined by the trial court, it is said:

"The prayer seems to have been founded on the idea, that the sale was fraudulent, if the vendees knew themselves to be insolvent at the time of the purchase and did not communicate that circumstance to the vendors, knowing at the time that they were ignorant of the fact and had not the means of becoming acquainted with it. The law, it seems, does not sanction such an elevated tone of morality in mercantile dealings as would have warranted the granting of the prayer, to the extent asked for * * * in this case. Such a strict and rigid doctrine, considering the vicissitudes and changes incident to mercantile life, would go far to cramp the operations of trade and commerce, and has not received the countenance of the courts of justice." Dalton v. Thurston, 15 R. I. 418, 7 Atl. 112, 2 Am. St. Rep. 905; Morris v. Shuster, 1 Mackey (12 D. C.) 190.

The judgment of the referee is affirmed.

---

### THE EROS.

(District Court, E. D. New York. October 30, 1916.)

1. SHIPPING ☞39—CHARTERS—CONSTRUCTION.
   A provision in a charter party that it shall be construed in accordance with the laws of a particular country does not limit the parties with respect to remedies, but simply supplies a particular rule of construction in case of dispute as to the meaning of its terms.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148.]

2. CONTRACTS ☞127(2)—SHIPPING ☞34—CHARTERS—ARBITRATION CLAUSE.
   A provision of a charter party that any dispute thereunder shall be submitted to arbitration goes to the remedy only, and its effect is to be determined by the law of the forum. Under the law of the American admiralty courts, such a clause cannot deprive the parties of the right to appeal to the courts.

   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 611; Shipping, Cent. Dig. § 120.]

3. SHIPPING ☞51—CHARTERS—BREACH.
   Claimant chartered his steam yacht in France by a time charter to libelant, to be delivered, with master and crew, for libelant's use at New York, where she arrived July 27, 1914. While minor repairs were being made, war was declared between France and Germany, and the master, under orders from claimant, refused to proceed on the ground that some of his crew were subject to mobilization for service in France. Such members were afterward discharged, and after some days of negotiations the master, under instructions from claimant, refused to fill the crew or move from the port, even within waters of the United States, and declared that "the whole thing is all off," whereupon libelant procured another yacht. The yacht was not requisitioned by the French government. *Held* that, under the facts, the action of claimant was not justified, and constituted a breach of the charter.

   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 203–210.]

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes