## In re P. H. KRAUSS & CO.

(District Court, W. D. Tennessee, W. D. February 21, 1924.)

No. 5410.

1. **Bankruptcy ⬤⇒212—Evidence held to show bankrupt hopelessly insolvent when ordering goods from claimant.**

Evidence *held* to show that bankrupt was hopelessly insolvent at time it ordered goods from claimant.

2. **Bankruptcy ⬤⇒212—Reclamation proceedings equitable.**

Proceedings by claimant to reclaim property in hands of bankrupt's trustee are always of an equitable nature.

3. **Bankruptcy ⬤⇒140(2)—Concealment of insolvency and want of expectation of ability to pay held fraud, entitling seller to reclaim property capable of identification.**

Where bankrupt, without disclosing that he knows himself to be hopelessly insolvent, and has no reasonable expectation or hope of being able to pay, orders additional merchandise, he commits a constructive fraud which entitles seller to reclaim the property from bankrupt's trustee, where not so intermingled with common stock of merchandise that it could not be distinguished.

4. **Bankruptcy ⬤⇒140(2)—Bankrupt buying, knowing he is insolvent, and that it will be impossible for him to pay, is conclusively presumed not to intend to pay.**

Where buyer makes purchase when he knows he is insolvent, and that it is or will be impossible for him to pay, a conclusive presumption arises that he does not intend to pay.

5. **Bankruptcy ⬤⇒212—Evidence held to warrant finding bankrupt did not intend payment of goods purchased while insolvent warranting reclamation.**

Evidence in reclamation proceedings of bankrupt's insolvency, and knowledge of bankrupt's officers that payment could not be made for goods purchased, *held* to warrant finding that bankrupt did not intend to pay, and to sustain conclusion that sellers were entitled to reclaim property.

In Bankruptcy. In the matter of P. H. Krauss & Co., bankrupt. Petitions for reclamation of property by the Davol Rubber Company, of Providence, and the Ingersoll Watch Company, of New York City, referred to C. L. Marsilliot, referee, to report as special master. Report, recommending allowance of claims, confirmed.

ROSS, District Judge. February 27, 1923, P. H. Krauss & Co., a Tennessee corporation, located at Memphis, Tenn., filed its petition in bankruptcy, and was duly adjudged a bankrupt on said date.

Two petitions have been filed in the matter seeking the reclamation of certain property, one of which was filed by the Davol

Rubber Company, of Providence, R. I., in which petitioner sought to recover goods shipped from Providence to bankrupt on February 13, 1923, and the other by the Ingersoll Watch Company of New York City, N. Y., in which it sought the recovery of goods shipped from January 17, 1923, to January 31, 1923.

Upon the filing of the petitions and answers thereto the matters were referred to Hon. C. L. Marsilliot, referee, for his report as special master upon the questions involved. Proof was heard upon the issues presented, and the special master has filed his report as to the rights of each claimant.

In each petition it was charged that, at the times the goods sought to be recovered were ordered, shipped, and received, the bankrupt was hopelessly insolvent; that the goods were obtained upon false and fraudulent representations as to its solvency; that it knew it would be unable to pay for the goods at such times; and that no intention existed on its part to make payment therefor, but that the respective petitioners relied upon the representations as to bankrupt's sound financial condition and shipped the goods in good faith. The answer presented the further issue that the goods had been so intermingled with the common stock of merchandise as that they could not be distinguished.

On the issue as to whether the goods had been so intermingled as that they could not be identified and separated from the common stock the master reported that the goods were kept separate and could be easily identified, and the record supports this finding.

On the question as to whether or not there was fraud practiced upon the respective petitioners, the report of the master on the questions of fact involved is so abundantly supported by the record, and his opinion as to the law applicable to this question is so clear, well reasoned, sound, and ably stated, that that portion of the report and of the opinion is here set out in full and adopted as a part of this opinion. It is as follows, omitting the reference to the record:

"Was any fraud, actual or constructive, practiced by the bankrupt in connection with the purchase?

"In order to reach a clear understanding of the transactions out of which this litigation arises, it will be necessary to give a brief history of the bankrupt concern during the two years immediately preceding the filing of the petition.

"The president of the company was Mr. A. Kaminsky, who first became associated with the company in August, 1920. Prior to that time Mr. Kaminsky had been in the dry goods business. He knew nothing of the drug business, and Mr. N. L. Cohen was the real manager of the concern.

"The first audit made of the books after Kaminsky became associated with the concern was completed about a year after Kaminsky purchased his stock, and showed a loss of between $6,000 and $7,000.

"Later, when Kaminsky went to make out his income tax return, which seems to have been somewhere between January 1, and March 15, 1921, another audit was made, which showed a profit of $600 or $700.

"In August, 1922, a third audit was made, which showed a loss of $10,000. A further audit was made, and inventory taken in the latter part of December, 1922, and in January, 1923, which indicated a loss of $4,000 or $5,000.

"It appears that in all of these audits there was carried an item of $14,000 for good will.

"The business showed an aggregate loss between August, 1920, and the time of the filing of the petition in bankruptcy on February 27, 1923, of about $20,000.

"During the last 12 months of the operation of the business Kaminsky was trying to sell it out, or to interest additional capital, but during that period the concern was 'in hot water' all the time, and never had a good day. Mr. Cohen knew of this condition of the business all the time.

"N. L. Cohen, who, as has been observed, was the real manager of the business, admits that the various audits indicated the same result as stated by Mr. Kaminsky.

"This witness states that he did not think up to the day of the filing of the petition that the concern was insolvent, because, in his opinion, the value of its assets exceeded its liabilities. This statement of the witness could not possibly be true, for the reason that the total unsecured claims at the time of the filing of the petition amounted to $50,179.89, whereas the appraisement was $18,713.07.

"This same witness states that it had been difficult for the concern to meet its obligations for a year, and that they never could have been met without outside help. Moreover, Cohen finally admitted that he gave up hope between February 10 and 15, 1923, that the concern would weather the storm. He testifies, however, that it was never the

intention of the concern not to pay for goods which had been ordered.

[1] "From this testimony, it is apparent that the company was hopelessly insolvent at the time it wrote to the petitioner the letter of February 8th, set out above, and which resulted in the shipment by petitioner of the merchandise now sought to be reclaimed.

"In that letter the bankrupt gave credit reference to the Waterbury Clock Company, Ingersoll Watch Company, and L. & H. Stern, Inc.

"While the Ingersoll Watch Company and the Waterbury Clock Company are, technically, two distinct corporations, they really constitute one concern.

"At that time, apparently, the concern did not owe L. & H. Stern, Inc., anything. On February 8th, the same day the bankrupt company wrote this letter to the petitioner urging it to ship these goods, it sent to the Ingersoll Watch Company, to which latter company it had referred petitioner as to its financial liability, a check for $1,301.46, payment of which was refused by the American Savings Bank & Trust Company of Memphis, on which it was drawn. The concern did not have the funds in the bank at the time this check was made, but hoped to get in collections in time to meet it.

"R. H. Parks, bookkeeper of the American Savings Bank & Trust Company, testified that from February 8th to the time of the filing of the petition in bankruptcy the concern never had a balance sufficient to meet this check of $1,301.46.

"It thus appears that Cohen, who was the actual manager of the business, caused this letter of February 8, 1923, to be written to the petitioner, giving the Ingersoll Watch Company as a credit reference, and, in order to induce the Ingersoll Watch Company to make a favorable report to any inquiry which might be made by the petitioner, sent to the Ingersoll Watch Company on the same day a check for $1,301.46, which Cohen knew was in excess of the concern's bank deposit, and which could not be paid unless collections were received in time to meet it, and this at a time when all parties connected with P. H. Krauss & Co. knew that it was insolvent.

"It is admitted that Kaminsky had indorsed several notes for the company and had stayed two or three judgments against them in an effort to avoid disaster. At the time of the filing of the petition Kaminsky had loaned the concern about $27,000. From these facts it would seem that there was no actual intent on the part of Kaminsky to defraud. On the other hand, Cohen, the real manager of the business, was, as we have observed, engaging in a financial jugglery of a reprehensible character. His conduct with reference to the letter of February 8, 1923, which must be imputed to the bankrupt corporation, amounted to a positive fraud on the petitioner.

"As to any actual intent on the part of those conducting the affairs of the concern not to pay for these goods there is no direct proof.

"This brings us to a discussion of the law on the subject. The question is by no means free from difficulty. The authorities are not uniform. For the reason stated at the outset of this report, the master has found it necessary to make an independent investigation, which has involved labor of no small proportions.

"The trouble in determining the rights of the parties in these reclamation cases arises from a lack of definite classification and differentiation as well as the conflicting pronouncements of the courts, hereinafter noted. It seems to the writer of this report that these controversies, so far as the facts are concerned, range themselves under the following categories:

"(1) Insolvency of buyer, concealment of, or misrepresentation as to, solvency, and actual intent not to pay.

"(2) Insolvency of buyer, concealment of, or misrepresentation as to, solvency, unaccompanied by an actual intent not to pay.

"(3) Insolvency of buyer, lack of reasonable expectation of ability to pay, concealment of this condition, but with no actual intent not to pay.

"Instances might arise requiring more detailed classifications, but for all practical purposes it would seem that this statement of the various phases of the facts of these cases will be at least helpful in an examination of the authorities.

"As to the first class, it may be said that direct proof of actual intent not to pay is seldom obtainable, even though the intent exists; hence some courts have declared that the establishment of certain facts will give rise to either a conclusive or persuasive presumption of such intention.

"As to the second and third classes the authorities are in conflict.

"From the proof here adduced, the master finds that the case at bar falls within the second class, or, to state it more definitely, the master finds that at the time of the purchase P. H. Krauss & Co. was hopelessly

insolvent, which fact it concealed from the petitioner, and that the letter of February 8, 1923, amounted to a representation of solvency, although there was no actual intent not to pay for the goods.

"The difficulty in arriving at an accurate statement of the law arises from an apparent holding in several cases that an intention not to pay, either presumed or established by direct proof, is an indispensable prerequisite to reclamation.

[2] "Reclamation proceedings are always of an equitable nature. They arise in two classes of cases. The first class consists of proceedings in equity, as distinguished from the second class, those in bankruptcy.

"An illustration of the first class is found in the case of Hyman v. Trow, 261 F. 991, in which the Circuit Court of Appeals for the Second Circuit laid down the rule that a petitioner in reclamation must establish three propositions: (1) Insolvency of the buyer at the time of the purchase; (2) concealment of such insolvency by the purchaser from the claimant in reclamation; and (3) intention of the buyer not to pay.

"We now review the leading authorities bearing upon the second class.

"In Davis v. Stewart (C. C.) 8 F. 803, the court said:

" ' "Where the purchaser is insolvent, and has no reasonable expectations or intention of paying for the goods, he gains no title against the vendor." It is not necessary to allege or show false pretense or other direct artifice. When no questions are asked, * * * no artifice resorted to, silence is not fraud; but concealment of insolvency, with no reasonable expectation of paying, renders a sale fraudulent.'

"In Gillespie v. Piles & Co., 178 F. 886, 102 C. C. A. 120, 44 L. R. A. (N. S.) 1, decided by the Circuit Court of Appeals for the Eighth Circuit, in 1910, the distinguished presiding judge Sanborn, said:

" 'An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchase, is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it.'

"In Re Spann, 183 F. 819, 25 Am. Bankr. Rep. 551, decided by the District Court for the Northern District of Georgia, in 1910,

the facts seem to be parallel with those of the case at bar. Smart Brothers & Co., petitioners in reclamation, sold certain shoes to Spann, the bankrupt, on June 13, 1910, and shipped the same on August 9, 1910. The shoes were received by the bankrupt August 10, 1910, 5 days prior to his adjudication in bankruptcy. There appears to have been no representation made by Spann as to his solvency, except a statement made to a mercantile agency in January, 1910, which seems not to have been relied upon by Smart Bros. & Co. There was no proof of an actual intention not to pay. The bankrupt testified that he had hopes of overcoming his difficulties.

"The court said:

" 'It is perfectly clear from the evidence, indeed from the evidence of the bankrupt himself, and it appears, I think, also clearly from the statement of the referee, that on August 10th, when these goods were received by the bankrupt and placed in his stock, that he knew he was insolvent. He must have known that it was entirely probable, and indeed almost certain, that within a very few days he would be compelled to acknowledge his bankruptcy and file a petition to have himself so adjudged. * * *

" 'If the purchaser concealed his insolvency and knowledge of the fact that he could not pay for the goods, it would void the sale both under the law of Georgia and the ruling of the Supreme Court of the United States [Donaldson v. Farwell et al., 93 U. S. 631, 23 L. Ed. 993].'

"An instructive decision is that of the Circuit Court of Appeals for the Third Circuit, November, 1911, in Halsey v. Diamond Distilleries Co., 191 F. 498, 112 C. C. A. 142. The opinion of District Judge Orr is appended in a note to the report of this case. The facts are briefly stated. The bankrupt, A wholesale liquor dealer, ordered certain whisky by mail from the distilleries company about 10 days before the bankruptcy, and while the purchaser was insolvent. There appears to have been a concealment of the fact of such insolvency, but no affirmative misrepresentation. Nor does there appear to be any direct proof of a lack of intention to pay.

"The opinion is very brief, and more information is gained from the decision of the district judge, which was affirmed. The district judge said:

" 'If he [the bankrupt] had knowledge of his own insolvency and of his inability to pay for the merchandise, his intention not to pay for it should be presumed. * * *

" 'In Pennsylvania, unfortunately, the doctrine has prevailed as expressed in the syllabus of Smith v. Smith, 21 Pa. 367, 60 Am. Dec. 51, as follows: "The intention of the buyer of goods at the time of purchasing them not to pay, together with his insolvency at the time and his knowledge of it, not communicated to the seller, will not avoid the sale after the delivery of the property sold."

" 'The doctrine announced by that case is not honest, and not good morals, and the courts of Pennsylvania have realized that fact, and have tried to get away from it with only a partial degree of success. The rule now is that, where any other fact exists, or there are any additional circumstances which reasonably involve a false representation, the court will hold that it is sufficient to take the case out of the rule.'

"In Re Watmough, 210 F. 539, decided by the United States District Court for the Northern District of Ohio, in 1913, the facts were:

"The bankrupt was doing a plumbing business in the city of Warren, Ohio. On December 4, 1912, he purchased from the Sterling Sanitary Manufacturing Company a bill of goods, amounting to $150. On December 6th the Sanitary Manufacturing Company shipped the goods to the bankrupt's place of business, where they were received on December 9th. On the same day Watmough filed a voluntary petition in bankruptcy. Watmough was insolvent at the time of the purchase, but concealed this fact from the Sanitary Manufacturing Company. There appears to have been no positive misrepresentation and no direct evidence of an intention not to pay.

"Judge Day said:

" 'It is plain from the record that the vendor was induced to sell his property by reason of the fraud of the vendee in concealing his financial condition. ⁎ ⁎ ⁎ When the sanitary company parted with the possession of its goods, by reason of the fraudulent inducement of the bankrupt, it was entitled to disaffirm the sale and recover such property from the vendee's trustee in Bankruptcy [citing In re Spann, 183 F. 819; Halsey v. Diamond Distilleries Co. 191 F. 498].'

"In Re Henry Siegel Co., 223 F. 369, decided by the District Court for the District of Massachusetts, in 1915, the facts are thus stated:

"During December, 1913, the Siegel Company was insolvent. The goods in question were ordered by the bankrupt from the petitioner in reclamation on December 22d. They were delivered on the 23d, 24th, and 27th of December, 1913. On the 29th of December, 7 days after the order, and 2 days after the last delivery, bankruptcy proceedings were instituted.

"The court said:

" 'The learned referee was of the opinion that an intent not to pay for the goods had not been made out. While such an intent must be, of course, established, it is not necessary that there should be direct evidence of it; it may be, and usually is, inferred from the facts. When these goods were purchased the buyer was deeply and hopelessly insolvent. Presumably the men in control of it were aware of its condition; there is no evidence to the contrary. They must have known, and their knowledge is imputable to the bankrupt, that it could not pay for these goods except at the expense of its other creditors, and by giving what would have been a preference; in other words, that it could not pay in an honest and regular way. Purchase under those conditions was, I think, the legal equivalent of purchase with an intent not to pay, and was fraudulent. In re Spann, 183 F. 819; Gillespie v. Piles, 178 F. 886. ⁎ ⁎ ⁎

" 'The intent not to pay, inferable from the financial condition of the buyer, might perhaps have been rebutted by evidence that its managers honestly expected to be able to continue, and bought the goods in an effort to do so. Nothing of that sort, however, appeared.'

"It will be noted that in this case the court held that an intent not to pay must be established either by direct proof or by the proof of facts from which such an intent might reasonably be inferred.

"In Re Hunter-Rand Co., 241 F. 175, decided by the District Court for the Eastern District of North Carolina, in 1917, there will be found an extended discussion of the law on this subject.

"It is not the purpose of the master to indulge in captious or presumptuous criticisms of the decisions of the federal district courts, but the suggestion is respectfully made that the opinion in the case last cited, if followed, must necessarily add confusion and uncertainty, rather than clarify the law on this subject.

"On several dates between March 28 and April 25, 1916, the Hunter-Rand Company ordered from the petitioners, in Baltimore, goods of the aggregate invoice value of $697.18. The goods were received by the bankrupt in the usual course of trade. At

the time of these purchases the Hunter-Rand Company was insolvent, and was adjudged bankrupt on May 5, 1916. The seller in Baltimore filed a petition in reclamation.

"In that case the court quoted the following statement from 24 Encyc. 1100:

." 'Mere insolvency of the buyer and failure to disclose it are not sufficient grounds for rescission, unless coupled with an intention not to pay for the goods, or the absence of any reasonable expectation of doing so.'

"The court further said:

" 'In German Nat. Bank v. Princeton State Bank, 128 Wis. 60, 107 N. W. 454, 6 L. R. A. (N. S.) 556, 8 Ann. Cas. 502, the trial court found, as a fact, that the party charged with the fraud was insolvent, which fact he did not disclose—that he made no representation in regard to his financial condition. The appellant insisted that his financial condition, at the time of the transaction, showed that he could have had no reasonable expectation of being able to pay, and therefore the court should have found that he had a definite purpose not to pay, whereas the court found, as a conclusion of fact, that he did not have the definite purpose not to pay, when he obtained the property. Winslow, Justice, in a well-considered opinion, clearly states the two grounds upon which the injured party has the right to rescind a contract of sale. He says:

" ' "It is well settled that a sale of property may be set aside as fraudulent, either (1) because it was induced by false and fraudulent representations which were relied upon by the seller; or (2) because of the existence of an undisclosed intention not to pay on the part of the buyer.

" ' "These are two separate and distinct wrongs; the first is complete without intent not to pay; the second is complete without false representations. Both may be present in a given case, but either is complete and actionable without the other."

" 'This I think an accurate and correct statement of the law. In that case the finding of the judge that there was no false representation, being affirmed, left the question open whether, upon the evidence, the trial court should have found an intention on the part of the buyer not to pay, because of the fact of insolvency. The learned justice, upon this question, said:

" ' "The law is settled that mere insolvency is not sufficient to prove intent not to pay; neither is a mere failure to disclose such insolvency, when not interrogated. The

buyer may hold his peace, if he is not asked; otherwise the door of hope would be well nigh closed to the struggling merchant whose liabilities exceed his assets. If there be an honest purpose to pay, undisclosed insolvency does not affect the validity of the transaction; there must also be a preconceived purpose not to pay."

" 'In the very exhaustive note to this case, the principles announced by the court are sustained by the weight of the decided cases. In Gillespie v. Piles, 178 F. 886, 102 C. C. A. 120, 44 L. R. A. (N. S.) 1, Judge Sanborn says:

" ' "It is conceded that the insolvency of a purchaser does not prove his intent not to pay for the goods which he buys."

" 'This is sustained by a wealth of decided cases cited in the notes, and I think may be regarded as "settled law." '

[3] "It will be observed that this in its essence is the very proposition which is condemned by Judge Orr in Halsey v. Diamond Distilleries Co. as being in accordance with neither honesty nor good morals, and the master finds himself wholly unable to accede to the doctrine thus laid down in Re Hunter-Rand Co., for the reason that, if the buyer be insolvent, with no reasonable expectation or hope of being able to pay, regardless of how good or bad his intentions may be, his concealment of the fact of his insolvency, plus the concealment of the fact of his lack of expectation, or hope of ability to pay, constitutes a constructive fraud, the actual practical effect of which renders it just as much an act of bad faith, and just as injurious to the seller, as if there had been an actual intention not to pay.

"A decision frequently cited, and which, in the opinion of the master, contains an accurate statement of the true rule, is that of Maxwell v. Brown Shoe Co., 114 Ala. 304, 21 So. 1009, in which the court said:

" 'A sale and purchase of goods is fraudulent and open to disaffirmance by the seller, when the purchaser was at the time thereof insolvent, or in failing circumstances, and had the design not to pay for them, or had no reasonable expectation of being able to pay for them, and either represented that he was solvent or intended to pay or had reasonable expectation of being able to pay, or failed to disclose his financial condition or the fact that he did not intend to pay or expect to be able to pay for the goods.'

"In the case at bar the bankrupt corporation not only concealed its insolvency and its

lack of reasonable expectation or hope of ability to pay from the rubber company, but on February 8, 1923, wrote the rubber company a letter which was equivalent to a representation of solvency, or to a representation of expectation of ability to pay.

"It is the view of the master that the holding in some of the decisions cited above that, in order to authorize a reclamation, there must be established in some way, either by direct proof, or by presumption, an intention not to pay lies at the foundation of the confusion which has arisen, so well illustrated in the opinion in In re Hunter-Rand Co. (D. C.) 241 F. 175.

"It is a fact, too well known to be ignored, that debtors in failing circumstances, with no well-founded expectation of being able to pay, but with no actual purpose not to pay, hoping by some stroke of good fortune, by some turn of the market, or by some favorable circumstances, to retrieve their unfortunate condition, purchase goods while concealing their insolvency, and while concealing their lack of expectation of ability to pay. This concealment, under such circumstances, unquestionably amounts to a fraud upon the seller, for the reason that the purchaser knows full well that, if the seller was made aware of the facts thus concealed, the goods would not be shipped.

"Inasmuch as fraud lies at the foundation of every reclamation, and inasmuch as the concealment just described unquestionably amounts to a fraud, frequently a gross fraud, how can it be said that such a fraud, to wit, the fraudulent concealment of the facts, is not sufficient to justify a rescission, regardless of the question of intention?

[4] "Of course, as stated by Judge Sanborn, in Gillespie v. Piles & Co., if the buyer makes the purchase at a time when he knows he is insolvent, and when he knows that it is, or will be, impossible for him to pay, a conclusive presumption will arise that he does not intend to pay.

"But to say that, if the buyer has made the purchase when he knows he is insolvent, and when he lacks reasonable expectation or hope of ability to pay, a presumption, persuasive or otherwise, arises of an intention not to pay can certainly not be an accurate statement, because the intention of the buyer may be honest, although his conduct in making the purchase under the circumstances is a constructive fraud, as serious in its consequences to the seller as if there had been an intention not to pay.

"An analysis of the jurisprudence on the subject, as a whole, reveals this situation:

"Some of the courts have held that concealment of insolvency, with no reasonable expectation of being able to pay, renders a sale fraudulent, and justifies a rescission, as illustrated in Davis v. Stewart; In re Spann, In re Watmough; and Maxwell v. Brown Shoe Co., supra.

"Other courts have held that an intention not to pay, either proved or presumed, is one of the prerequisite elements of the right to reclaim, as in Gillespie v. Piles & Co.; In re Henry Siegel Co.; and In re Hunter-Rand Co., supra.

"This contrariety of opinion has led to an unfortunate confusion.

"It is apparent that to say that proof of an intention at the time of the purchase not to pay is an indispensable element must necessarily work a grave injustice to the seller, and make rescission for fraud well nigh impossible, because of the natural and inherent difficulty of making such proof. To avoid this difficulty, and in order to afford relief in meritorious cases, the courts in some instances have held that the establishment of certain facts would give rise to a conclusive presumption of an intention not to pay, and proof of certain other facts would create a persuasive presumption to that effect; and in the effort to find a way out by the presumption route the whole subject has been involved in much doubt and uncertainty, because it has been held, as in Re Henry Siegel Co., that these presumptions as to intent may be rebutted by evidence.

"If, therefore, the buyer purchase goods while insolvent and with no reasonable expectation of being able to pay for them, which facts he conceals from the seller, and if a presumption thereby arises of an intention not to pay, and if this presumption is rebutted by proof, where does that leave the seller?

"The logical and necessary result, from which there can be no escape, is that, although the buyer has deliberately purchased the goods with a knowledge of his insolvency and with knowledge that he has no well-founded hope of ability to pay, and although he has concealed these facts from the vendor, thus perpetrating upon the latter fraud as disastrous in its effect as an original intention on the part of the vendee not to pay, there can be no rescission, and the vendor is without remedy, as held by Judge Connor in Re Hunter-Rand Company.

"Is this the law? If it is, the whole fabric of commercial credit rests upon a foundation so insecure that he who parts with his

goods without the cash or its equivalent in collateral is merely inviting disaster. Such a theory, as pointed out by Judge Orr in Halsey v. Diamond Distilleries Company, can find no justification in honesty or good morals, and must be rejected as unsound and subversive of that fundamental maxim of Anglo-Saxon law that "equity will not suffer a wrong without a remedy."

"From what has been said, the master has reached the conclusion, after a careful review of the authorities, that a purchase of goods while the buyer is insolvent, with no well-founded expectation or hope of payment, and where the buyer conceals the fact of the insolvency and conceals the fact of his lack of expectation or hope of payment, is a constructive fraud upon the seller, which will justify a rescission, regardless of the intention of the buyer as to payment.

"The master, therefore, reports and recommends that the prayer of the petition should be granted."

[5] As above stated, all the master's findings of facts are well supported by the record. In fact, in some respects perhaps, the record would have justified a stronger finding against the bankrupt, in that he finds there is no direct proof as to any actual intent on the part of those conducting the affairs of the bankrupt concern not to pay for the goods ordered. Strictly speaking, this may be true, but certainly the record discloses that, if there existed no actual intent not to pay for the goods ordered, there existed that state of facts within the knowledge of the parties conducting the business which leaves no escape from the conclusion that they were bound to know they could not pay for the goods so ordered by them, and it is difficult to distinguish between knowledge on the part of one that one could not pay for an article ordered and intent on one's part not to pay for it. The result to the seller is the same. The fraud in legal contemplation is just as great, and in this view of the case the record would have justified a finding that the purchasers did not intend to pay for the goods because they knew they could not pay for them.

The law requires that parties deal with each other in good faith. Justice, right, and good conscience demand it. Confidence in the rectitude of those engaged in the various branches of commerce would be wholly without foundation did not the law afford protection where one in good faith parts with his property upon representations made by another as to solvency, or ability to pay, which an ordinarily prudent man would accept as true.

In this case this concern was wholly insolvent when the goods were ordered and when they were received. The parties operating were bound to have known of its hopeless condition. They knew they could not pay for these goods. They had no right to gamble with the property of others. The law will not remain inactive where one relies upon chance and trusts that some good turn of fortune will enable such one to meet responsibilities, which all reason necessarily makes plain is at most but the faintest hope. Can it be said that one can remain blind to facts which even the slightest investigation or the slightest exercise of diligence would reveal, and then, when that one's acts have jeopardized the rights of another, plead ignorance of those conditions to the injury of such party? The law will not permit this. And certainly it would not be right in the instant case where these petitioners shipped their goods in all confidence that they would receive payment therefor, and at a time when they had a right so to believe, and when, but for the importunities and representations of those in charge of the business of the bankrupt, they would not have been shipped, and, when they can be identified as the record discloses, to have those goods now taken from them and the value thereof applied pro rata upon the debts of others not so situated and who possess no such rights.

In addition to the law cited by the master it is laid down as a broad proposition in Collier on Bankruptcy, vol. 2, p. 1719, that:

"Knowledge of inability to pay when the purchase is made is equivalent to purchase with intent not to pay, and such purchase is constructively fraudulent.

"Good faith which rests only on ignorance due to a willful or reckless or despairing failure to face the facts is, in proceedings of this sort, the legal equivalent of actual fraud, and entitles the seller to reclaim his goods."

In support of this proposition there are cited, in addition to some of the cases above mentioned, Ellet-Kendall Shoe Co. v. Ward, 26 Am. Bankr. Rep. 114, 187 F. 982; Matter of Underwood & Daniel (D. C.) 32 Am. Bankr. Rep. 779, 215 F. 279; Matter of Gurvitz (D. C.) 47 Am. Bankr. Rep. 311, 276 F. 931; Jones v. Hobbie Groc. Co., 40 Am. Bankr. Rep. 414, 246 F. 431, 158 C. C. A. 495; Matter of Siegel Co. (D. C.) 35 Am. Bankr. Rep. 130, 223 F. 369.

While in a number of cases it is held that, in addition to the matter of insolvency, there must exist the intention not to

pay at the time goods are ordered or received, yet the better reasoning is and certainly the more just ground that, where goods are ordered by one who is insolvent, who is aware of that fact and who has no reasonable expectation of being able to pay for such goods, it must be in law regarded as the equivalent of an actual intent not to pay.

The only exception to the report of the master is that he should have found that P. H. Krauss & Co. made no representation of solvency, and that its president was paying its obligations, that the orders for goods in question were made in good faith, and that under such facts the petitioners would not be entitled to reclaim the merchandise in question. This exception must be overruled.

The report of the master as to each petition is confirmed, and an order will be accordingly prepared for entry.