GILLESPIE v. J. C. PILES & CO. et al.

In re PILES et al.

(Circuit Court of Appeals, Eighth Circuit. April 18, 1910.)

Nos. 102, 3,124.

*(Syllabus by the Court.)*

1. SALES (§ 52*)—FRAUD OF BUYER—INSOLVENCY—IMPOSSIBILITY OF PAYMENT.

An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay, is conclusively presumed to have bought the goods with an intention not to pay for them.

A presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could have had no reasonable expectation of paying for them.

But insolvency is insufficient to establish such an intent.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 123; Dec. Dig. § 52.*

Misrepresentation and concealment by vendee of goods as to financial condition as affecting validity of contract of sale, see note to William Openhym & Sons v. Blake, 87 C. C. A. 126.]

2. BANKRUPTCY (§§ 272, 482*)—FEES OF ATTORNEYS OF TRUSTEE NOT PAYABLE OUT OF PROPERTY OF ADVERSE CLAIMANT.

A court of equity, and a court of bankruptcy is a court of equity, may not take out of a fund or property in its custody and pay compensation for the services of an attorney or of any other party rendered to recover or retain the fund or property from its equitable owner.

It is only when such services have had the effect to recover or preserve the property for its true owner that a court may pay compensation therefor out of the property. Services injurious to the rightful owner may not be thus compensated at his expense.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 272, 482.*]

3. BANKRUPTCY (§§ 223, 368*)—PERCENTAGES OF REFEREE AND TRUSTEE NOT ALLOWABLE OUT OF PROPERTY OF ADVERSE CLAIMANTS.

Property which comes to the possession of the trustee in bankruptcy through the fraud of the bankrupt and is adjudged to be returned to the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

victim of the fraud is not a part of the estate of the bankrupt, and the referee and trustee may not be allowed their statutory percentages out of it.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 223, 368.*]

4. BANKRUPTCY (§§ 140, 267, 223, 368*)— FRAUDULENT SALES—ALLOWANCES OUT OF PROPERTY OF ADVERSE CLAIMANT—COMPENSATION OF ATTORNEYS.

An insolvent bought property at a time when he knew it was impossible for him to pay for it. He was adjudged bankrupt, and a receiver was appointed, who took the property and sold it as perishable under the order of the court. The vendors rescinded the sales to the insolvent and demanded the proceeds of the property. The trial court found that the sales were fraudulent, and ordered the trustee to pay out of the proceeds of the property $300 to his attorneys, the percentages of these proceeds allowed by the bankruptcy law to referees and trustees on estates administered in bankruptcy, and unpaid freight charges for the transportation of the property before the adjudication, and to return the balance of the proceeds to the vendors.

*Held*: (1) The vendors were entitled to recover the proceeds of the property from the trustee in bankruptcy, because the insolvent did not intend to pay for the property when he bought it.

(2) Neither the trustee nor his attorney had any legal or equitable claim for compensation out of these proceeds for services rendered to bring them into or to retain them in the estate of the bankrupt, because their services were not beneficial, but were deleterious, to the equitable owners of the property and its proceeds.

(3) Neither the referee nor the trustee had any legal or equitable claim to payment out of these proceeds of the percentages allowed them by the bankruptcy law on estates administered in bankruptcy, because these proceeds were no part of any such estate.

(4) The order that the trustee pay out of these proceeds to railroad companies the unpaid freight charges upon the property was erroneous, because no claim or proof of any lien thereon for such charges was proved or presented, no railroad companies to which such charges were due were specified, and no amounts were found due in the order.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. §§ 140, 267, 223, 368.*]

Appeal from and Petition for Review of Order of the District Court of the United States for the Southern District of Iowa.

Petition of J. C. Piles & Co. and others in the matter of the estate of Louis R. Hough, bankrupt. From an order of the District Court, reversing a finding of the referee against the petitioners, John L. Gillespie, trustee in bankruptcy, appeals. J. C. Piles & Co. and others file a petition for review. Modified and affirmed.

Clinton L. Nourse (Robert J. Bannister, on the briefs), for appellant.

J. B. Rockafellow (A. C. Parker, Howard J. Clark, J. B. Sullivan, C. A. Dudley, and N. E. Coffin, on the briefs), for appellees.

Before SANBORN, Circuit Judge, and RINER and WILLIAM H. MUNGER, District Judges.

SANBORN, Circuit Judge. Louis R. Hough entered upon the business of buying and selling hogs at Des Moines, Iowa, in the spring of 1905, with a capital of $100 and a debt of $2,000, and continued in this business until on June 26, 1908, he had accumulated property worth $20,000 and debts exceeding $100,000, when he was adjudged a bank-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

rupt on an involuntary petition filed during the afternoon of that day. A receiver then appointed took possession of nine car loads of hogs which had been shipped to Hough by vendors from different towns in Iowa on the preceding day, and had arrived, been received, and accepted by him in Des Moines on that day. By order of the court the receiver sold the hogs as perishable property on the next day, and realized from five car loads that had been shipped by J. C. Piles & Co., a copartnership, $4,926.63, from one car load that had been shipped by Rose & Snider, a copartnership, $787.75, from one car load that had been shipped by Matt Johnson $1,023, and from one car load that had been shipped by David Horsman $980.37. The five vendors intervened in the proceeding in bankruptcy and prayed that the moneys thus obtained by the receiver be paid over to them (1) on the ground that their respective sales of these hogs to Hough were induced by false representations of his financial success and by a fraudulent concealment of his insolvency, and (2) because, when he bought the hogs, he intended not to pay for them. J. C. Piles & Co. and Matt Johnson also claim that they never sold to Hough the hogs which they shipped to him. But the referee and the court below both found that they made these sales, and a careful perusal of the evidence has convinced that this finding was right. The referee also found that none of the sales was induced by fraudulent representations or concealment, that Hough was insolvent when he purchased the hogs, but that there was an absence of any intent on his part not to pay for them, and he consequently denied the prayers of the interveners. The District Court reversed this conclusion, and ordered the trustee to pay the proceeds of the sale of the hogs to the respective vendors, less $65 expenses of yardage and feed, the statutory percentages of the referee and trustee upon these proceeds, $300 attorney's fees, and the unpaid charges due to the railroad companies for the transportation of the hogs to Des Moines. From this order the trustee appealed, on the ground that the evidence did not sustain the finding of any fraudulent representation or concealment, or of any intent not to pay for the hogs by Hough; and the vendors challenge the order by a petition for review, because the payment of the freight charges and the fees of the officers and attorneys out of the proceeds of their hogs is unauthorized by law.

A vendor, who sells personal property to an insolvent vendee, who at the time he buys does not intend to pay for it, may rescind the sale and recover the property or its proceeds from any one but an innocent purchaser, and neither a receiver nor a trustee in bankruptcy is such a purchaser. A decisive question in the case therefore is: Did Hough intend not to pay for these hogs when he bought them? They were shipped to him at Des Moines from different stations in Iowa on the afternoon of June 25, 1908, without any agreement that specified the price at which Hough should buy and pay for them because the shippers knew that he was buying hogs and they wanted to send them to him that day. He was out of the city of Des Moines, and there was no one at his office who could specify a price. They were unloaded, watered, and fed at Hough's yards in Des Moines by his employés during the night of June 25 and the morning of June 26, 1908, and they were accepted by Hough, and the price was fixed and entered upon his books, with

one or two exceptions, in which it was not named at all, during the forenoon of June 26, 1908. Hough had then been insolvent, and had been aware of that fact for many months. Between October 1, 1907, and June 26, 1908, he had bought hogs the purchase price of which amounted to $1,556,666; but he had lost money during each month— in October, $4,864.21; in November, $3,326.31; in December, $9,- 785.35; in January, $8,297.51; in February, $153.65; in March, $11,- 889.80; in April, $14,298.75; in May, $16,091.43. He knew that he had been and was losing money; but he was trading on a falling market. and he was hoping to retrieve his losses upon a rising one. He had managed to continue in this business by these means. He paid the Century Savings Bank of Des Moines $1 per thousand for exchange. He purchased hogs by the use of the telephone in the country and caused them to be shipped to his yards at Des Moines, where he sorted and graded them, and immediately shipped them to purchasers from him in other states. He generally attached the bills of lading to sight drafts on the purchasers, and deposited them with the bank, which immediately gave him credit for the amounts, of these drafts. The money he obtained in this way he did not use to pay the vendors from whom he had purchased the hogs that produced this money; but he used it to pay the most pressing vendors of hogs from whom he had previously purchased. The result of this system was that he was unable to pay promptly for the hogs which he purchased, and his indebtedness to vendors and his delay in payment of them constantly increased. During the spring and summer of 1908 he owed to such vendors from $75,000 to $100,000. He had no way to pay any of them. except by buying more hogs of others and using the money derived from the sales of their hogs for the purpose of paying earlier vendors. He knew this condition of things perfectly, and strove to increase his purchases and his sales in order to get money to use in this way. The bank was not ignorant of his condition, and he owed it only about $1,500 upon a note which he had given to it. On June 25, 1908, he was in Chicago. His clerk and the manager of his business in Des Moines in his absence was H. M. Lanterman. On June 24, 1908, the Des Moines bank refused longer to honor Hough's checks, charged against his credit his note of $1,500 which it held, and returned the note to Lanterman. The latter telegraphed Hough to come home, whereupon Hough in Chicago called Lanterman and talked with him over the telephone on the morning of June 25th. Lanterman then told him that they had failed, and to Hough's answer, "We can continue to buy hogs," he replied:

"We failed. The Century Savings Bank have refused to honor any more checks signed by you or I whatever."

Hough arrived at Des Moines about 5 o'clock in the morning on June 26th, and met Lanterman before 6. Many of his creditors had called and demanded payment the day before. Lanterman told him this fact, and all the other facts which have been recited. He met the cashier of the bank about 9:30; but he did not see him for the purpose of arranging to continue in his business, nor did he try to do so. He went to see him for the purpose of complying with the demand of the agent of A. G. Buchanan & Son, one of his creditors, from

whom Lanterman had bought six car loads of hogs, that he had immediately sold, and for the proceeds of which he had given a draft in favor of the bank in accordance with Hough's usual practice. Buchanan & Son demanded that these proceeds should be diverted from the bank to pay them for these hogs, and Hough and the bank sent a telegram to the purchaser to accomplish this result.

From this brief review of the undisputed evidence it will be seen that this was the situation when the hogs of the interveners were bought. Lanterman knew on the evening of June 24th, the day before the interveners shipped their hogs to Hough, that the bank would honor no more checks of Hough or of himself, that it had appropriated Hough's credit there to pay his note to the bank, and that Hough could not pay for any more hogs. Lanterman was the agent of Hough in charge of his business at Des Moines, and his knowledge was under the law the knowledge of Hough. On the morning of June 25th, before any of these hogs were shipped, Lanterman informed Hough of the material part of these facts, so that the latter had actual knowledge of them, and before the hogs were accepted by Hough, and before their purchase prices were fixed or specified, he had acceded to the demand of Buchanan & Son, and had learned all the facts that have been set forth in this opinion.

It is contended, and it is conceded, that the insolvency of a purchaser does not prove his intent not to pay for the goods which he buys. Many an insolvent obtains goods on credit with the honest intent to pay for them, and many times he succeeds in doing so. It is probable that Hough in this case bought and paid for hogs whose purchase price was more than $1,200,000 while he was insolvent, and he undoubtedly intended to pay for them when he bought them by buying and selling the hogs of other vendors and appropriating their proceeds to make the payments, in the hope that the market would change and the losses he was constantly sustaining would change to profits. As long as vendors would sell to him and the bank would honor his drafts, such an intent was possible, and if, when the hogs of these interveners were shipped and were accepted, it had been possible for Hough to have continued to carry out his scheme, to have purchased of other vendors, to have drawn the proceeds of the sales of their hogs to the bank, and to have used them to pay earlier vendors, or even if he could have had a reasonable expectation that he could have continued to do these things, the finding of the referee that he had no intent not to pay for these hogs might have been sustained.

But he was not in the same financial or mental condition when he purchased of the interveners that he had occupied when he bought of earlier vendors. When he made the earlier purchases he had a reasonable expectation that he could pay for the hogs he purchased with the proceeds of hogs of later vendors in the way in which he had paid for other purchases for months. But when he bought of the interveners he knew that he had no money or credit with which to pay for their hogs, that the only way in which he could pay for them was by the purchase and the sale of the hogs of subsequent vendors and the appropriation of the proceeds of these later purchases through the bank to the payment of the interveners,

and he knew that he could not pay for them in that way because subsequent vendors would not sell to him after his known failure, and the bank would not take his drafts or honor his checks. In this state of the case it is incredible that he intended to pay for these hogs when he bought them. He knew it was impossible for him to pay for them, and the human mind is so constituted that it cannot harbor a serious intent that the being it directs shall do that which it knows it is impossible for it to accomplish. An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases, is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it. Talcott v. Henderson, 31 Ohio St. 162, 165, 27 Am. Rep. 501; Deere, Wells & Co. v. Morgan, 114 Iowa, 287, 289, 86 N. W. 271; Franklin Sugar Ref. Co. v. Collier, 89 Iowa, 69, 73, 56 N. W. 279; Davis v. Stewart (C. C.) 8 Fed. 803, 804; Morrow Shoe Mfg. Co. v. New England Shoe Co., 57 Fed. 685, 693, 6 C. C. A. 508, 515, 516, 24 L. R. A. 417. There was no error in the finding of the court that Hough bought the hogs of the interveners with the intention not to pay for them, nor in its order that the trustee pay over to them the proceeds of the hogs less the expense of their feeding and yardage.

The trustee objects to the consideration on the interveners' petition for review of the legality of the order for the payment out of the proceeds of the hogs of the $300 to the attorney for the trustee, of the statutory percentages to the referee and the trustee, and of the freight charges for the transportation of the hogs, on the ground that these objections do not present questions of law, but require a review of the facts of this case. But none of the averments of the petition of the interveners was denied, the attorney for the trustee made a written stipulation that this case upon the petition for review should be consolidated with the case on the appeal of the trustee, which has been discussed, and that the parts of the record in the latter case that are material, relevant, and competent to the issues upon the petition for review might be used by reference thereto with the same effect as though they were part of the record herein. The evidence in the case upon the appeal of the trustee has been reviewed, and the conclusion and order of the District Court that the interveners were entitled to the proceeds of the hogs because Hough obtained them by a fraudulent purchase has been affirmed.

In view of these facts, the determination of the questions presented by the petition for review involves the consideration of no issues of fact. It presents nothing but the pure questions of law whether or not a court of bankruptcy may lawfully pay out of the proceeds of property which the bankrupt has fraudulently obtained from a third party and delivered to a receiver or trustee the attorney's fees incurred by the latter to keep these proceeds from their true owner and to realize upon the fraud, the commissions of the trustee and referee upon these proceeds that are allowed by the amended bankruptcy act upon

estates administered by the court of bankruptcy (Act July 1, 1898, c. 541, §§ 40, 48a, 30 Stat. 556, 557, U. S. Comp. St. 1901, pp. 3436, 3439, as amended by Act Feb. 5, 1903, c. 487, §§ 9, 11, 18, 32 Stat. 799, 800, U. S. Comp. St. Supp. 1907, pp. 1029, 1030, 1033, Supp. 1909, pp. 1313, 1317), and the charges of railroad companies, not named, which the carriers have neither claimed nor proved for the transportation of such property before the bankruptcy.

A court of equity, and a court of bankruptcy is a court of equity, may lawfully pay out of a fund or property which the trustee of an estate recovers for or preserves to the estate by means of the services of attorneys reasonable compensation for those services; but the reason for such an allowance is that the equitable owners of the fund or property recovered or preserved derive a much larger benefit from the services of counsel than the compensation allowed, and a substantial benefit from such services to the real owners of the fund or property is the sine qua non of such an allowance or payment. Trustees v. Greenough, 105 U. S. 527, 532–7, 26 L. Ed. 1157. There is a manifest injustice and inequity in taking out of a fund or property in the custody of a court compensation for the services of an attorney or for the service of any other party by means of which the fund or property has been taken or kept from its true owner. The latter ought not to be required to pay for services which have been a positive detriment to him. And courts of equity may not lawfully take out of a fund or property in its custody and pay compensation for the services of an attorney of a trustee or for the services of any other party by means of which the fund or property has been taken or detained from its equitable owner. Hobbs v. McLean, 117 U. S. 567, 581, 6 Sup. Ct. 870, 29 L. Ed. 940.

The hogs whose proceeds are in question were rightfully taken into his possession and immediately sold by the receiver under the order of the court, because they were in the possession of the bankrupt when he was appointed, and for the necessary expenses of yardage and feeding, the receiver or his successor, the trustee, was properly allowed compensation by the order of the court below. But when the interveners gave notice to the receiver or to the trustee that they elected to rescind the fraudulent sales, and demanded the proceeds of this property, the subsequent holding of the receiver and the trustee became wrongful, and the services of his attorneys in their endeavor to sustain the claim of the estate of the bankrupt to this property were injurious to its equitable owners, and compensation for them may not be lawfully paid out of these moneys. The services thus rendered were not services for the owners of these proceeds, but services against them. They were services for the estate in bankruptcy and for the creditors who will ultimately share in that estate, and that estate and those creditors alone are chargeable with liability for them. The order that $300 shall be paid to the attorneys for the receivers out of the moneys derived from the sale of the hogs was error, and it must be set aside.

The amended bankruptcy act provides that referees shall receive "from estates which have been administered before them one per centum commissions on all moneys disbursed to creditors by the trustee," and that trustees shall receive "from estates which they have

administered such commissions on all moneys disbursed by them as may be allowed by the courts, not to exceed six per centum on the first $500.00 or less, four per centum on moneys in excess of $500.00 and less than $1,500.00, two per centum on moneys in excess of $1,500.00 and less than $10,000.00 and one per centum on moneys in excess of $10,000.00," and that neither the referee nor the trustee shall be allowed or shall receive any other compensation for their services than these percentages and certain fees and allowances that are not material to the issue here presented. 32 Stat. 487, §§ 9, 11, 18, pp. 799, 800, U. S. Comp. St. Supp. 1907, pp. 1029, 1030, 1033. The court ordered that out of the proceeds of the hogs there should be paid to the referee and trustee the percentages specified in these sections of the bankruptcy law. But these proceeds were no part of the estate of the bankrupt, and they could not be "administered" as such before the referee or by the trustee. They were the property of the interveners, which the trustee had obtained possession of through the fraud of the bankrupt, and which it was his duty to return to the interveners immediately upon their rescission of the sales and their demand for the property. The latter were not creditors of the estate. The proceeds here in question were not distributable to the creditors of the estate or to the creditors of Hough. They were the property of the interveners, and the direction that these percentages should be paid to the referee and the trustee out of these proceeds cannot be sustained. Property which comes to the possession of a trustee in bankruptcy through the fraud of the bankrupt, and is adjudged to be returned to the victim of the fraud, is not a part of the estate of the bankrupt, and the referee and trustee may not be allowed their statutory percentages out of it. In re Anders Push Button Telephone Co. (D. C.) 136 Fed. 995; In re Hinckel Brewing Co. (D. C.) 124 Fed. 702, 704; In re Utt, 105 Fed. 751, 45 C. C. A. 32; In re Fort Wayne Elec. Corp. (D. C.) 94 Fed. 109; Smith v. Township of Au Gres, Michigan, 150 Fed. 257, 261, 80 C. C. A. 145, 149, 9 L. R. A. (N. S.) 876; In re Iowa Falls Mfg. Co. (D. C.) 140 Fed. 527, 528.

Finally, no railroad company proved or presented any lien for any freight charge upon the hogs in question here or upon their proceeds. No railroad company was a party to this proceeding, and the order that the trustee pay out of the proceeds of the sales of these hogs "to the respective railroad companies transporting said nine (9) cars of hogs all unpaid freight thereon," without naming the companies or specifying the amounts, was erroneous.

The order of the court below must be modified, by eliminating from it the directions to pay out of the property in controversy the $300 attorney's fees, the percentages to the referee and trustee, and the unpaid freight, and in other respects it must be affirmed. The appellees may recover costs on the appeal, and the petitioners the costs on the petition for review.