In re Sheila J. WIDNER, Debtor.

First North American National
Bank, Plaintiff,

v.

Sheila Widner, Defendant.

Bankruptcy No. 7–01–03810–WSA.
Adversary No. 7–01–00179–WSA.

United States Bankruptcy Court,
W.D. Virginia,
Roanoke Division.

Nov. 6, 2002.

Jeffrey A. Fleischhauer, Roanoke, VA, for First North American National Bank.

Jo S. Widener, Bristol, VA, for Sheila J. Widner.

## MEMORANDUM OPINION

WILLIAM F. STONE, Jr., Bankruptcy Judge.

This adversary proceeding came before this Court for trial on August 22, 2002 in order to determine the dischargeability of debt arising from the Defendant's credit card purchases pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 523(a)(2)(A). The issue raised by the Plaintiff is whether the Defendant possessed fraudulent intent when she made certain purchases on a credit card issued by the Plaintiff.

The Plaintiff contends that the Defendant intended to obtain credit by false pretenses, false representations, or actual fraud by using the credit card issued by the Plaintiff during a "spending spree" from June 8 through June 21, 2001 totaling $1683.23. (Complaint) The Defendant denied that she possessed fraudulent intent in her Response and testified to that effect at trial.

### FINDINGS OF FACT

The Defendant had known for a long time before she filed bankruptcy on September 4, 2001 that she was in financial distress. According to her testimony at trial, the Defendant knew she was in trouble two years previously. (p. 27, line 6) She testified that she had not been able to make regular payments on any account in the year preceding her bankruptcy. (p. 45, lines 11–12) The Defendant's debts totaled $55,830 when she made the contested charges in June 2001. (p. 28, lines 14–16) Her total listed liabilities in her bankruptcy schedules were $70,504.52, of which $58,116.33 was credit card debt. In addition, the balances for two other accounts were stated to be unknown. She had been unemployed since 1989 and had been receiving Social Security income since 1990. (Interrogatory #7) At the time of the charges, the Defendant's household income could not cover monthly expenses. (p. 28, line 16). Her assets listed in her schedules were valued at $4,800.00, consisting of a truck, van and household furniture items.

The Defendant received advice in April or May of 2001 to contact credit card creditors about the possibility of receiving hardship relief. (p. 23, lines 9–12) The Defendant testified that she called most creditors around April or May. (p. 25, line 23)

She asked the Plaintiff for hardship consideration but did not receive any. (p. 23, line 18) Discover Card agreed to reduce required monthly payments as long as it could withdraw them out of her bank account. (p. 23, lines 19–21) The Plaintiff testified that, with the exception of Discover Card, most of her creditors raised her minimum payments so high that she could no longer afford the monthly minimum after she called to ask for hardship relief. (p. 36, lines 20–22)

While the evidence does indicate that the minimum payments did rise significantly on several accounts, whether this occurred in response to the Plaintiff's phone calls is not clear. The evidence suggests that the payment amounts began to rise when the Defendant stopped making minimum payments. For example, the minimum payment due on the Plaintiff's account by May 19, 2001 was $254.00. (Plaintiff's exhibit # 1). The Defendant paid that amount on May 16, 2001 and made no further payments. The amount due in June then rose by around $10.00 and by July 20, 2001 the minimum amount due was $596.00. This amount appears to comprise two minimum payments and a late charge.

The Defendant had two accounts with First National Bank of Omaha (Plaintiff's exhibits # 13 and # 14). On the account reflected in Plaintiff's exhibit # 13, the statement that closed on April 27, 2001 indicated that a payment of $200.00 had been received earlier that month and that a minimum payment of $174.00 was due on May 24, 2001. The next statement, which closed on May 30, 2001, indicated that the Defendant paid $175.00 by the due date and that at least $171.00 was due on June 22, 2001. No further payments were made and the minimum amount due by July 24, 2001 rose to $346.00. This amount is nearly exactly twice the amount of the previous

minimum amount due and therefore appears to account for the payment missed the previous month. On the account with First National Bank of Omaha reflected in Plaintiff's exhibit # 14, the statement that closed on April 27, 2001 showed that the Defendant made a payment of $80.00 and that a minimum amount of $78.00 was required by May 24, 2001. The statement that closed on May 30, 2001 reflected that the Defendant paid $78.00 on May 18, 2001 and that the minimum amount of $78.00 was due by June 22, 2001. The following statement, which closed on June 28, 2001, showed that no payment had been received during that period and that the minimum payment due by July 24, 2001 was $158.00.

Similarly, the Defendant paid $100.00 to Gold MasterCard on April 20, 2001. The statement which reflected that payment showed that a minimum amount of $98.00 was due by May 16, 2001. The Defendant paid $8.00 on May 17, 2001 and the minimum payment due by June 15, 2001 only increased to $117.00. When no payment was received by June 15, 2001, the minimum amount due by July 16, 2001 doubled to $238.00, presumably to account for the missed payment (Plaintiff's Exhibit # 16). No further payments were made and the minimum amount due by August 15, 2001 was $495.00. Similarly, the May statement for BankOne reflected that the minimum payment due by June 18, 2001 was $52.87. That statement reflected that a payment of $40.00 had been received on April 30, 2001 and $100.00 had been received on May 13, 2001. However, the next statement shows that no payment was made in June and the minimum amount required by July 21, 2001 was $156.00. The minimum payment due on the First National Bank of Omaha account remained constant at $78.00 while payments in that amount were being received, but then rose to $158.00 due by July 24, 2001 when no

payment had been made on the previous statement. (Plaintiff's exhibit # 13)

The factual issue at hand, and a very close question it poses, is whether the Defendant knew at the time she used credit extended by the Plaintiff that she would not be making further payments to the Plaintiff. The Defendant testified that the principal reason she incurred charges in June on the Plaintiff's account was because the company had increased her credit limit by $1,500. (p. 77, line 17) However, she denied that she intended not the repay the charges. The evidence reveals a pattern of ceasing to charge after stopping payments. For example, the Defendant made the last charge on her Amoco credit card on June 16, 2002 and made the last payment on June 19, 2002 (Plaintiff's exhibit # 19). She made the last charge on the Associate's Gold MasterCard on May 15, 2002 and made the last payment on May 17, 2002 (Plaintiff's exhibit # 16). The Discover card account presents an exception to this trend. In contrast to other creditors, the minimum payment requested by Discover Card dropped from $239.00 on the statement closing April 17, 2001 to $118 on the statement closing May 17 and then to $60 on the statement closing June 17, 2001. (Plaintiff's Exhibit # 15). The last charge on the Discover card is reflected on the statement dated April 17, 2002 and the last payment was made in July. (Plaintiff's exhibit # 1) Notably, though, Discover Card was the only creditor which granted the Defendant hardship consideration.

The Plaintiff's account statement closing on April 24, 2001 reflects that between March 25 and April 24, 2001 the Defendant made six charges totaling $345.96 on the account and paid $500.00. (Plaintiff's exhibit # 1) The Defendant testified that the funds for the $500.00 payment came from her tax refund. (p. 28, lines 2–3) The following statement, which closed on May 24, 2001 shows that between April 26 and May 16, 2001 the Defendant made three charges totaling $328.92 and paid $254.00. (Plaintiff's exhibit # 1). The statement for the following month, closing on June 25, 2001, reflects that between June 11 and June 25, 2001 the Defendant made twenty charges totaling $1,683.23, but made no payments. (Plaintiff's exhibit # 1) The statements closing on July 24, 2001 and August 24, 2001 indicate that no further charges or payments were made on the account. (Plaintiff's exhibit # 1)

The Defendant's last payment to the Plaintiff on her account was $254.00 in May, 2001. (Plaintiff's exhibit # 1) The fact that the Defendant made no payment on her account with the Plaintiff in June is inconsistent with her prior practice of paying at least the monthly minimum. The timing of the Defendant's last payment to the Plaintiff in May viewed with respect to her pattern of ceasing to charge after making her last payment suggests that she knew at some point in June that she would not making further payments on this account. However, she continued to charge in June even after failing to make the June payment. The statement for the period closing June 25, 2002 reflects that the Defendant had charged at a higher frequency during such period than in past months. Based on the foregoing evidence, the Court finds that by June 18, 2002 the Defendant knew that she simply was not going to be able to pay further charges. The Court finds by a preponderance of the evidence that by June 18, 2001, the due date for the June payment, the Defendant knew that she would not be making a payment on that account for that month and that she knew that she was not going to be able to pay further charges. On and after that date the Defendant personally made charges on the account totaling $661.25. (Plaintiff's exhibit # 1). The

Court further finds, however, that she did not make the charges in question with a positive intent not to repay the charges.

The distinction in the Court's view between finding the absence of an intent not to repay the charges and a finding that she knew that she would not be able to pay the charges is perhaps the difference between intent to evade payment, on the one hand, and desperation, on the other. It appears that during June she simply did not have the necessary funds to pay for what she and her family needed. The Court does not doubt that if the Debtor had won the lottery or otherwise had unexpected good fortune, she would have gladly and promptly paid the Plaintiff and her other creditors. Her making of the extraordinary $500.00 payment on the Plaintiff's account just two months prior to the charges in dispute in this adversary proceeding is telling evidence of her general intent to pay her obligations rather than avoid them. Nevertheless, the Court believes that by June 18, 2001 the Debtor knew that she was not going to be making the required June payment, that she and her husband were too deep in debt to continue making the minimum monthly payments demanded by the credit card companies, that in particular she would not be able to pay her debt to the Plaintiff in the future, and that nevertheless on and after such date she personally made nine charges on the account in the amount of $661.25 without expectation that she would be able to pay them.

## CONCLUSIONS OF LAW

This Court has jurisdiction of this proceeding by virtue of the provisions of 28 U.S.C. §§ 1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July 24, 1984. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

Bankruptcy Code § 523(a)(2)(A) excepts from discharge ... "money, property, services... obtained by false pretenses, a false representation, or actual fraud...". Bankruptcy Code § 523(a)(2)(C) provides a presumption for the purposes of § 523(a)(2)(A) that certain debts have been fraudulently incurred and therefore are excepted from discharge. Those presumed fraudulent debts are (1) consumer debts owed to a single creditor that were incurred within sixty days of the order of relief for luxury goods and total more than $1,150 and (2) cash advances aggregating more than $1,150 under an open end credit plan within sixty days before bankruptcy. No such presumption arises in this case because (1) all of the charges were incurred more than sixty days before bankruptcy, (2) no cash advances were involved, and (3) no real showing of charges for "luxury goods" has been made. However, because the categories of debt listed in § 523(a)(2)(C) are not exhaustive, any credit that the Defendant obtained by fraudulent means may be deemed nondischargeable.

■ The determinative issue is whether the Defendant possessed fraudulent intent when she obtained credit from the Plaintiff. The Plaintiff bears the burden of proving fraudulent intent by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), *In re Powell*, 213 B.R. 306, 309 (Bankr.W.D.Va.1997). This Court will not follow the principle urged by the Plaintiff and which was adopted in the case of *In re Vermillion*, 136 B.R. 225, 226–27 (Bankr. W.D.Mo.1992). There the Bankruptcy Court for the Western District of Missouri held that the use of a credit card is a representation of an ability to pay as well as of an intent to pay. Rather, this Court adopts the reasoning set forth by Judge Small in *In re Koop*, 212 B.R. 106, 109

(Bankr.E.D.N.C.1997), which relies on the Supreme Court's interpretation that "[t]he operative terms in § 523(a)(2)(A), 'false pretenses, a false representation, or actual fraud,' carry the acquired meaning of terms of art. They are common-law terms, and as will shortly see in the case of 'actual fraud' which concerns us here, they imply elements that the common law has defined them to include." *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351, 361 (1995). To establish a cause of action for fraudulent misrepresentation, "actual and 'justifiable' reliance are required." *Id.* at 362. The Supreme Court also noted that "We construe the terms in § 523(a)(2)(A) to incorporate the general common law of torts, the dominant consensus of common-law jurisdictions, rather than the law of any particular State." Fn. 9 at page 362 of 133 L.Ed.2d. In reaching this conclusion, the Supreme Court stated as follows, "Then, as now, the most widely accepted distillation of the common law of torts was the Restatement (Second) of Torts (1976), published shortly before Congress passed the Act." *Id.* The Second Restatement of Torts addresses the issue of when a debtor possesses fraudulent intent and illustrates how proof of such an intention can be shown. Section 530(1) states that "A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have the intention." Comment (c) to § 530(1) elaborates that "[t]he intention of the promisor not to perform an enforceable or unenforceable agreement cannot be established solely by proof of nonperformance, nor does his failure to perform the agreement throw upon him the burden of showing that his nonperformance was due to reasons which operated after the agreement was entered into. The intention may be shown by any other evidence that sufficiently indicates its existence, as, for example, the certainty that he would not be in funds to carry out his promise."

■ Based on the *Field* holding, Judge Small enunciated in *Koop* that if the Court is to apply the common law definition of fraud for purposes of § 523(a)(2)(A), then the emphasis must be on the debtor's intention, rather than ability, to repay. 212 B.R. at 108. The test for fraudulent intent "therefore is not the objective standard or whether a reasonable person would have known there was an inability to pay, but the objective standard of the debtor's intention to repay." *Id.* For a thorough recent scholarly review of the difficulties encountered in applying the concepts of fraudulent misrepresentation and actual fraud to improvident credit card use, see Margaret Howard, *Shifting Risk and Fixing Blame: The Vexing Problem of Credit Card Obligations in Bankruptcy,* 73 American Bankruptcy Law Journal 63 (Winter 2001).

The Western District of Virginia has held that "Only if the . . . unfulfilled promise . . . is made with an intent to deceive or mislead is it actionable as fraud." *Woodring v. Board of Grand Trustees,* 633 F.Supp. 583, 591 (W.D.Va.1986). Also addressing unfulfilled promises, the Virginia Supreme Court explained that "One of these exceptions [to the general rule that an unfulfilled promise does establish fraud], the plaintiffs point out, is where an action for fraud and deceit is predicated on promises which are made with a present intention not to perform them, or on promises made without any intention to perform them." *Lloyd v. Smith,* 150 Va. 132, 145, 142 S.E. 363, 365 (1928). More recently, the Virginia Supreme Court stated that "[T]he gist of fraud in such cases is not the breach of the agreement to perform, but the fraudulent intent." *Patrick v. Summers,* 235 Va. 452, 369 S.E.2d 162, 164 (1988). The Bankruptcy Code refers spe-

cifically in § 523 to "actual fraud," which American Jurisprudence explains as follows:

> To constitute positive or actual fraud, there must be such fraud as affects the conscience-that is, there must be an intentional deception. In other words, active and positive fraud includes cases of the intentional and successful employment of any cunning, deception, or artifice to circumvent, cheat, or deceive another. Actual fraud is embraced generally, however, under the two heads of suggestion of falsehood (suggestio falsi) or false representation, and suppression of the truth (suppressio veri) or concealment. Actual fraud usually involves dishonesty of purpose or intent to deceive, and, as distinguished from constructive fraud, involves the element of deceit practiced upon the party defrauded.

37 Am Jur 2d 22, Fraud and Deceit § 4 (1968). "[A] party must be shown either to have known that he could not carry out his present intention, or not to have intended to carry it out, before a promise to do an act in the future can amount to a false representation." 37 Am.Jur.2d 100, Fraud and Deceit § 64 (1968), citing *Flaherty v. Schettino*, 136 Conn. 222, 70 A.2d 151 (1949) (Because there was "no finding either that he knew he could not pay for the goods when he ordered them or that he did not intend to pay for them...the trial court was justified in ruling that he was not guilty of fraud." 70 A.2d at 153). Perhaps more importantly to the determination by this Court of whether the purchase of goods with actual knowledge that they can't be paid for is legally equivalent to an intent not to pay for them is the opinion authored by Chief Judge Parker of the United States Court of Appeals for the Fourth Circuit in the case of *Manly v. Ohio Shoe Co.*, 25 F.2d 384 (4th Cir.1928). That case dealt with a seller's successful attempt to reclaim goods sold and delivered to its customer prior to the latter's bankruptcy filing. The opinion states in part as follows:

> In the first place, the evidence justifies the conclusion that, when bankrupt gave the order for the shoes, its officers knew that it was hopelessly insolvent and had no reasonable prospect of paying for them except by giving an unlawful preference. This is the equivalent of "intent not to pay." (citations omitted)

25 F.2d at 385. Judge Parker then went on to quote with approval the following passage from the Eighth Circuit's opinion in the case of *Gillespie v. J.C. Piles & Co.*, 178 F. 886 (8th Cir.1910):

> An insolvent buyer, who knows at the time of his purchase that his financial condition is such that it is and will be impossible for him to pay for his purchases, is conclusively presumed to have bought them with an intention not to pay for them; and a persuasive legal presumption to that effect arises from the fact that such a purchaser's affairs were in such a condition at the time of the purchase of the property that he could then have had no reasonable expectation of paying for it.

25 F.2d at 386 quoting from 178 F. at 891. Such rationale is not universally accepted, however. This issue was considered in the case of *Watson v. Silsby*, 166 Mass. 57, 43 N.E. 1117 (1896), which stated as follows:

> The difference between a purchase of property with an intention not to pay for it, and a purchase with knowledge that one has not the means of paying for it, nor any reasonable expectation of ever being able to pay, and with no definite intention in regard to paying, is slight, and in reference to the probability of payment is practically of but little importance. An intention is ordinarily to

be inferred from conduct and circumstances. But to constitute a fraud which will avoid the contract, there must be a definite conscious intent not to pay.

43 N.E. at 1118. If that language were to control the result in the case before this Court, it would have to enter judgment for the Defendant as it has not found that a "definite conscious intent not to pay" has been established by the Plaintiff's evidence.

The Fourth Circuit does not have any cases that establish inferences that arise as to a debtor's intent when the debtor continues to incur charges upon accounts upon which he has ceased making payments or has requested payment deferments or reductions (*i.e.,* "hardship" relief). However, the Eastern District of Virginia Bankruptcy Court has held that the Court may consider a debtor's financial condition at the time of making credit card charges as evidence of fraud if it suggests that the Debtor was aware of a hopeless inability to pay. *American Express Centurion v. Choi (In re Choi),* 203 B.R. 397 (Bankr.E.D.Va.1996) (Tice, C.J.). Similarly, Judge Tice also determined that credit card charges incurred when the debtors "were well aware that they could not pay when they made the charges and must have known that payment was unlikely" were non-dischargeable in the case of *Citibank v. Hale (In re Hale),* 274 B.R. 220, 223 (Bankr.E.D.Va.2001). This Court holds that charges incurred with either the intent not to repay or actual knowledge that they would not be repaid are fraudulent under § 523(a)(2)(A) of the Bankruptcy Code. The foundation for this holding is constructed from the following elements:

1. One's use of a credit card constitutes implied representations to the card issuer that he or she in good faith intends to pay the credit advanced upon such customer's authorization and that he or she affirmatively believes in good faith that such credit will be repaid;

2. Even in the absence of affirmative evidence from the card issuer that it relied upon such implied representations in extending credit, it is presumed as self-evident, unless the contrary affirmatively appear from the evidence, that such issuer did in fact materially rely upon such representations because a creditor in an arm's length transaction would not reasonably be expected knowingly to make a loan to one who either did not intend to repay it or did not actually believe that he would be able to repay it; and

3. That unless it be shown that the card issuer possessed knowledge of facts from which the falsity of such implied representations was known to it, the creditor justifiably relied upon such implied representations of its customer's good faith in honoring the credit extensions requested by the customer. See Restatement of the Law, Second, Torts, §§ 541 and 544 (1977) (The American Law Institute).

This case is distinguishable from a recent unpublished Fourth Circuit Court opinion finding that the debtor believed she would be able to pay for her credit card purchases. *Citibank v. Parker,* 23 Fed.Appx. 125, 2001 U.S.App. LEXIS 24599 (4th Cir. Nov. 16, 2001). In *Citibank* the court considered the debtor's testimony that she had sufficient cash in her account and sufficient income from her husband's business to cover the purchases she made. The *Citibank* debtor paid the full balance on her credit card in July, 2000 after she had decided to file bankruptcy. After paying off the account in July, the debtor then made new charges before her credit card was cancelled and made two payments on the account after filing for bankruptcy. She also testified

that she did not realize that the debt would be included in her bankruptcy and that she tried to maintain the account and keep it from being put in her petition. Unlike that debtor, the Defendant had no means of paying when she made the charges. Her testimony confirms that she was living off credit cards when she made the charges at issue. (p. 50, line, 15)

## CONCLUSION

For the foregoing reasons, the Court finds that charges personally made by the Debtor after June 17, 2001 are hereby non-dischargeable debt pursuant to 11 U.S.C. § 523(a)(2)(A). The Plaintiff also seeks an award of attorney's fees in the sum of $500.00 incurred in this adversary proceeding. While such amount is certainly reasonable and doubtless is less than its actual fees incurred, it advances no statutory or contractual basis for such an award. The account agreement was not offered into evidence. Even if it had been, the Court reaches no conclusion that contractual liability for attorney's fees incurred in obtaining a determination of non-dischargeability as to the basic debt are likewise non-dischargeable. Accordingly, such request is denied. The Court will award interest to the Plaintiff at a rate of 9.00% per annum, the Virginia judgment rate of interest, from July 1, 2001 until paid upon the amount of debt determined to be non-dischargeable ($661.25). The Plaintiff shall also recover its taxable costs herein. An order in accordance with this memorandum opinion shall be entered contemporaneously with its signing.